M.C. JEFFERS, Al Porter, Evangeline Brown, Clyde Collins, O.C. Duffy, Earl Foster, the Rev. Ellihue Gaylord, Shirley M. Harvell, Linda Shelby, J.C. Jeffries, Lavester McDonald, Joseph Perry, Clinton Richardson, T.E. Patterson, Earnest Simpson, Brian Smith, and Charlie Statewright, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Bill CLINTON, in his Official Capacity as Governor of Arkansas and Chairman of the Arkansas Board of Apportionment; W.J. McCuen, in his Official Capacity as Secretary of State of Arkansas and Member of the Arkansas Board of Apportionment; and Steve Clark, in his Official Capacity as Attorney General of Arkansas and Member of the Arkansas Board of Apportionment, Defendants.

No. H–C–89–004.

United States District Court, E.D. Arkansas, E.D.

Feb. 9, 1990.

Order Feb. 9, 1990.

Order on Clarification Feb. 16, 1990.

Opinion on Reconsideration March 5, 1990.

Final Order March 5, 1990.

Order on Motion for Stay March 5, 1990.

Dissenting Opinion of Chief District Judge Eisele March 6, 1990.

P.A. Hollingsworth, Little Rock, Ark., L.T. Simes, II, West Helena, Ark., Kathleen Bell, Helena, Ark., Olly Neal, Jr., Marianna, Ark., Don E. Glover, Dermott, Ark., Penda D. Hair, Washington, D.C., Donna L. Dennis, New York City, Julius L. Chambers, Dayna L. Cunningham, Sherrilyn Ifill, N.A.A.C.P. Legal Defense Fund, Inc., New York City, and Sheila Y. Thomas, N.A.A. C.P. Legal Defense Inc., Washington, D.C., for plaintiffs.

Frank J. Wills, III, Atty. General's Office, Little Rock, Ark., for defendants.

Before ARNOLD, Circuit Judge, EISELE, Chief District Judge, and HOWARD, District Judge.

ARNOLD, Circuit Judge.

(Filed Feb. 9, 1990)

On December 4, 1989, we held unlawful the present plan of apportionment for the Arkansas General Assembly and directed the defendant Board of Apportionment to submit a new, lawful plan by January 15, 1990. 730 F.Supp. 196. On January 16, 1990 (the time being extended one day on account of a legal holiday), the Board submitted its new plan. On the next day, January 17, the plaintiffs, having obtained a further one-day extension from us, submitted an alternative remedy plan. Plaintiffs take exception to four of the districts proposed by the Board, two in the House and two in the Senate. We also have before us subsequent filings from both plaintiffs and defendants.

We now approve the plan submitted by the Board, except that it must be modified in accordance with plaintiffs' objections with respect to House Districts (HD) 74 and 75 and Senate District (SD) 19 (SD 30 according to the Board's numbering system). Plaintiffs' objections with respect to their proposed SD 27 are overruled.

## I. PENDING MOTIONS

Before dealing with the merits, we first address two pending motions. On January 25, 1990, a group of five black registered voters from Crittenden County filed a Motion for Leave to File Objections to Remedial Plans and to File Alternative Remedial Plan, or in the Alternative, to Intervene as Parties Plaintiff. These voters are James Wilburn, Christine Brownlee, James Walter Adams, Louise Evans, and the Rev. Robert

Nelson. And on February 1, 1990, the defendant Bill Clinton, Governor of Arkansas and Chairman of the Board of Apportionment, filed a Motion for Leave to File Memorandum of Fact and Law in Support of an Alternative Remedy Plan.

The motion of James Wilburn and others will be denied. They seek to object both to the plan submitted by the Board and to the plaintiffs' alternative plan. Their objections are confined to one proposed district, the Senate District referred to as SD 30 in the Board's plan and as SD 19 in the plaintiffs' plan. Under the Board's plan, SD 30 would have a black voting-age percentage (BVAP) of 55%. Plaintiffs' proposed SD 19 would have a BVAP of 60.5%. The Wilburn petitioners propose changes in plaintiffs' SD 19 that would increase its minority population. They say that plaintiffs' SD 19 has a total black population of 64%,[1] while their own proposed SD 19 would have a total black population of 66%. Their papers do not tell us what the BVAP of their proposed SD 19 would be, but it seems likely that it would be in the neighborhood of 61 or 62%.

■ These petitioners claim a right to be heard on two bases. First, they argue that, if a class action had been certified in this case, they would be class members and would have a right to be heard on any proposed remedy. The short answer to this contention is that this is not a class action. Plaintiffs' motion for class certification was denied because it was untimely. Petitioners next argue, and with some justification, that the case is the functional equivalent of a class action. It affects the rights of all citizens in their part of the State, and their general interests are congruent with those of the plaintiffs. In the non-class-action context, this kind of interest is amply safeguarded by Fed.R.Civ.P. 24, which provides for intervention by non-parties who need to become parties to protect their interests. So, in the alternative, petitioners ask to intervene as parties plaintiff. Their request is for permissive intervention under Fed.R.Civ.P. 24(b).

■ Petitioners' motion for leave to intervene is denied as untimely. This case has been pending for more than a year. Petitioners appear to be politically active and knowledgeable citizens. Three of them are elected mayors of municipalities in Crittenden County, and another is a former volunteer deputy voter registrar. The last-named person, the Rev. Robert Nelson, was one of the witnesses for plaintiffs at the trial of this case. Certainly Mr. Nelson was well aware of the pendency of the case, the issues involved, and the potential effect of any order, and it is fair to assume that the other petitioners were too. Petitioners knew that our order of December 4 would require the formulation of a new plan, and that the Board would be holding public hearings to carry out our order. Presumably they had an opportunity to appear at these hearings, if they did not do so in fact. If intervention were to be allowed now, these proceedings would be seriously complicated and delayed. Filing for the party primaries opens on March 20, 1990. See Ark.Code Ann. § 7-7-203(c) (1987). It is important for legislative districts to be settled well in advance of that date, so election officials, candidates, and the public can understand and get used to the new system. If petitioners were allowed to come into the case now, time would have to be given to answer their complaint in intervention, and another trial would have to be held, because the complaint makes allegations of fact that, so far as we know, would be contested by other parties, either the Board or the plaintiffs. In all of the circumstances, we believe that we should exercise our discretion to deny petitioners' motion.

■ The Governor's motion, on the other hand, will be granted. As Chairman of the Board of Apportionment, he is already a party to this case. One purpose of his motion is simply to get before the Court the views which he expressed at meetings of the Board. The Governor dissented in part from the Board's action adopting the plan that is now before us. His position

---

[1] This figure is actually 65.94%. See Plaintiffs' Supplement to Proposed Remedy Plan, p. 2, filed January 26, the day after the Wilburn petitioners' motion was filed.

does not require us to decide any issues of fact not already in the case as a consequence of the Board's plan and the plaintiffs' objections. Therefore, no delay in final disposition would be occasioned. The defendant Clinton's motion for leave to file a memorandum of fact and law in support of an alternative remedy plan is therefore granted. His substantive contentions will be considered at the appropriate place later in this opinion.

## II. THE HOUSE

The Board's House plan creates 21 new House districts, of which eight have black voting-age majorities. (The other 13 are created because of the ripple effect produced by the changes necessary to create majority-black districts.) The BVAP in the eight majority-black districts range from 53% in HD 80 to 64% in HD 82. Only one of the eight has a BVAP in excess of 58%, and that one, HD 82, is similar to existing HD 82, which already had a black-voting age majority and has been represented by a black State Representative since 1973.

Plaintiffs take exception to HD 74 and HD 75 as proposed. HD 74 as proposed has a BVAP of 58%, includes parts of Lee and St. Francis Counties, and has a resident incumbent white State Representative. HD 75 as proposed has a BVAP of 56%, includes parts of Monroe and Phillips Counties, and also has a resident incumbent white State Representative. Plaintiffs say these percentages are too small to give black voters a realistic chance to elect representatives of their choice. They propose modifications under which HD 74 will have a 63% BVAP, and HD 75 a 64% BVAP. If we understand the situation correctly, no incumbent would reside within HD 75 if it were revised in accordance with plaintiffs' position. The change, however, would put two incumbent white Representatives in the same district.

The law requires equal opportunity. It does not require proportional representation, or that black political superiority be ensured by artificial means. On a strictly numerical and quantitative view of equali-ty, any district with a BVAP of 50% or higher would be *per se* lawful. We think the Voting Rights Act means something more than this. Suppose two people are in a race, and one of them has had to run the first three laps with a 100–pound weight on his back. Suddenly it occurs to the referee that this is unfair. Something must be done to correct the injustice. Is it corrected just by removing the weight from the disadvantaged runner for the last lap? Of course not. If no more than this is done, equality of opportunity is nothing but an empty promise, a form of words better left unsaid by honest people. Past injustice, especially centuries of it, cannot be ignored. In Justice Blackmun's elegant phrase, "[i]n order to get beyond racism, we must first take account of race." *University of California Regents v. Bakke*, 438 U.S. 265, 407, 98 S.Ct. 2733, 2807, 57 L.Ed.2d 750 (1977) (separate opinion).

It was just this reasoning that led this Court, less than two years ago, to hold unanimously that something on the order of a 60% BVAP is required to remedy a vote-dilution violation of the Voting Rights Act. *Smith v. Clinton*, 687 F.Supp. 1361, 1362–63 (E.D.Ark.) (three-judge court), *aff'd mem.*, 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988). We said:

> In shaping a remedy under the Voting Rights Act, this Court must "exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 31 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 208 (footnote omitted). It is widely understood that "minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice." *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). Moreover, the extent to which minorities must outnumber whites in the relevant jurisdiction is a matter of "gen-

eral acceptance in redistricting jurisprudence." *Id.* at 1415–16 (citing cases).

A guideline of 65% of total population is frequently used, and is derived by supplementing a simple majority with an additional 5% to offset the fact that minority population tends to be younger than that of whites, 5% for the well-documented pattern of low voter registration, and 5% for low voter turnout among minorities. When voting-age population figures are used, a 60% nonwhite majority is appropriate. *Id.*

687 F.Supp. at 1362–63 (footnote omitted).

■ The present case is indistinguishable from *Smith* in any significant way. We are bound by *Smith*. The doctrine of *stare decisis* is strongest in matters of statutory interpretation, and that's what this case is about—determining the meaning of the Voting Rights Act at the remedial stage of a case in which defendants are proven violators of the law. The districts proposed by plaintiffs are no less compact and contiguous than those proposed by the Board. They would meet the 60% rule of thumb. The law requires us to adopt them.[2]

Defendants point out that they are the authorities charged by law with drawing the lines. Their action represents official State policy. It should be treated with some deference. If the districts they propose would have been upheld at the liability stage of the case, they must be upheld now. See *McGhee v. Granville County*, 860 F.2d 110, 115 (4th Cir.1988). At least in the present context,[3] we agree with all of that. But the point is precisely that the Board's HDs 74 and 75 would have been held unlawful at the liability stage of this case, simply because they are (1) below 60% BVAP and (2) easily expanded without sacrificing principles of compactness and contiguity.

In reaching this result, we act against a well-documented factual background of black political disadvantage, some of it due to intentional racial discrimination. The proof before us, some of which is detailed in our opinion filed December 4, 1989, is every bit as cogent on the point, if not more so, than was the proof in *Smith*. See also the declaration of Jerry Wilson, attached to plaintiffs' Memorandum of Law in Support of Remedy Plan. Defendants have not contested any of Mr. Wilson's factual allegations.[4]

If there were a good reason—some neutral, nondiscriminatory reason—for the way HD 74 and HD 75 have been drawn by the Board, the result might well be otherwise. The Board's submission, however, suggests no such reason, and we can think of none. The only reason that comes to mind is the desire to make it easier for white incumbent legislators to win re-election against black challengers, coupled with the desire to avoid races in which one white incumbent legislator must run against another. The Board's plan as submitted includes only two districts, one in the House and one in the Senate, in which incumbents would have to run against each other. Both these districts are in the Pine Bluff–Jefferson County area. All other things being equal, there is nothing wrong with a desire to protect incumbents. But in the

---

**2.** Defendants' five other proposed black-majority House Districts (38, 80, 83, 88, and 100) are all below 60% BVAP, but they are not for that reason unlawful. Plaintiffs have not objected to them, presumably because there is no practical way to increase their BVAP while still meeting reasonable standards of compactness and contiguity.

**3.** The concept of equal opportunity necessarily contains some imprecision. At the remedy stage—a violation having been established—it may be appropriate to resolve some marginal doubts against the wrongdoers. Courts should not be grudging in remedying injustice. "Equity delights to do justice, and not by halves." It is

unnecessary to resort to this line of reasoning to resolve the present case.

**4.** Plaintiffs ask for an evidentiary hearing in the event that defendants contest any of their factual allegations. See Memorandum of Law in Support of Remedy Plan, p. 3. No such contest has occurred. The Board has not asked for an evidentiary hearing. It is fair, therefore, to take these allegations as uncontested, if not admitted. The allegations build mainly on proof already in the record, anyway. The Board's motion to strike the affidavit of Olly Neal is denied as moot. Plaintiffs have withdrawn the affidavit.

present case, all other things are not equal. The desire to protect incumbents, either from running against each other or from a difficult race against a black challenger, cannot prevail if the result is to perpetuate violations of the equal-opportunity principle contained in the Voting Rights Act.

For these reasons, we will adopt the Board's House plan, modified, however, in accordance with plaintiffs' present proposals as to HD 74 and HD 75. In taking this action, we also adopt in principle the position taken by Governor Clinton in his separate filing. Like the plaintiffs, he objects to the Board's plan on the ground that it fails to create a majority-black district without an incumbent in Eastern Arkansas, the center of black population. We agree with the Governor that the Board's approach does not present "the best opportunity to resolve the historic dilution of black voting strength in that region." Defendant Bill Clinton's Memorandum of Fact and Law, p. 3. We adopt plaintiffs' alternative rather than the Governor's because the plaintiffs' plan is more fully articulated: it clearly indicates how the ripple effect is handled, and what the BVAP in each district will be.

### III. THE SENATE

Defendants' Senate plan creates eight new districts, SDs 18, 19, 27, 28, 29, 30, 34, and 35. Six of these districts owe their existence to the ripple effect. The other two, SD 27 and SD 30, have black voting-age majorities. SD 27 has a 58% BVAP, and SD 30 has a 55% BVAP. A white incumbent Senator lives in proposed SD 30, but no incumbent Senator lives in proposed SD 27.

Plaintiffs object to both of these districts, making the same type of argument that we have already considered in respect to the House. In place of the Board's proposed SD 30, they propose a district, numbered 19 according to their system, that would include portions of Crittenden, Cross, Lee, Phillips, and St. Francis Counties. Plaintiffs' SD 19 would have a 60.5% BVAP. For reasons already discussed in connection with the House, we hold that

this objection is well taken. Defendants have suggested no countervailing policies. Plaintiffs' SD 19 would include the residences of two incumbent white State Senators, but, as we have already explained, that consideration cannot prevail in the present context.

Plaintiffs also object to the Board's proposed SD 27. It would have a BVAP of 58% and would not include the residence of any incumbent Senator. Plaintiffs' proposal, which would also be a non-incumbent district, would result in a BVAP of 61%. We reject plaintiffs' position with respect to this district. Plaintiffs point out, and it is true, that a higher BVAP in SD 27 could have been obtained simply by adding certain portions of the City of Pine Bluff to the district instead of a largely white township, Cane Creek, located in Lincoln County. The Board articulates no reason for the selection of Cane Creek over the suggested portions of Pine Bluff, but we do not believe this is fatal to the Board's position. As noted above, the Board, as the regularly constituted authority for this kind of decision, is entitled to some deference. If it creates a district in which, in practical terms, black voters have an equal opportunity, we do not think it should be faulted for failing to give black voters an additional edge. Here we again take our cue from *Smith v. Clinton, supra.* There, a 60.55% BVAP district, in which an incumbent white State Representative resided, was held to comply with the law fully. We think a 58% BVAP district with no white incumbent is the equivalent in practical political terms. The opportunity to run for an open seat is worth at least two or three points. This is especially true when we consider that the white incumbent in question, if SD 27 had been drawn to include his residence, would have been a prominent State Senator who has recently been elected Chairman of the Democratic Party of Arkansas.

For these reasons, the Board's Senate plan will be adopted, modified, however, in accordance with plaintiffs' objections with respect to the Board's proposed SD 30, numbered SD 19 in plaintiffs' listing.

■ Governor Clinton also objects to the Board's Senate plan, but for reasons other than the plaintiffs'. He argues that the population difference between SD 28 and SD 29 is 11.5% (using 1980 census numbers, which are the most reliable data we have and the basis for all our other computations). This difference, he says, exceeds the 10% deviation which the Supreme Court has indicated is presumptively lawful. *See, e.g., Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977). In the first place, the deviation involved here is, according to our computation, 10.9%, not 11.5%. "Deviation" or "variance," for this purpose, does not mean the percentage difference between the population in the two districts to be compared, here SD 28 and SD 29. It means, instead, the total deviation of these two districts from the norm, or the ideal district if absolute population equality were to be achieved. SD 28 is 5.8% above the norm, and SD 29 is 5.1% below it, so the total deviation is 10.9%. We do not find this discrepancy sufficiently significant to justify rejecting the Board's plan. That plan represents official State policy. It is close to the 10% rule of thumb. The Board justifies it by pointing, among other things, to the desireability of keeping three cities in Lonoke County in the same district. This is an entirely legitimate community-of-interest consideration. There are no racial implications in this difference between districts. Both of them will be majority white no matter how this issue is resolved. All of these reasons combine to persuade us not to upset the Board's action on this question.

## IV. CONCLUSION

An order is being entered today to carry out the conclusions expressed in this opinion. We remind the parties that the question of preclearance under Section 3 of the Voting Rights Act, 42 U.S.C. § 1973a(c), remains pending. The Court is working on this issue and will file its opinion in due course.

It is so ordered.

* Modified by order of Feb. 16, 1990, see p. 1202.

EISELE, Chief District Judge, dissents, and will file an opinion in due course stating his views.

### ORDER

(Filed Feb. 9, 1990)

ARNOLD, Circuit Judge and GEORGE HOWARD, Jr., District Judge.

In accordance with the opinion filed today, it is CONSIDERED, ORDERED, ADJUDGED, and DECREED as follows:

1. The motion of James Wilburn, Christine Brownlee, James Walter Adams, Louise Evans, and the Rev. Robert Nelson for leave to file objections to remedial plans and to file alternative remedial plan, or in the alternative, to intervene as parties plaintiff, is denied.

2. The motion of the defendant Bill Clinton for leave to file memorandum of fact and law in support of an alternative remedy plan is granted.

3. Defendants are instructed to adopt, as the plan of apportionment of the Arkansas General Assembly in effect henceforth and until the adoption of a new plan following the 1990 Census, the plan submitted by the Board of Apportionment on January 16, 1990, modified, however, in accordance with plaintiffs' objections with respect to House District 74, House District 75, and Senate District 30 (Senate District 19 in the plaintiffs' listing). So long as plaintiffs' plan with respect to these three districts is adopted in full, the Board is free to adopt its own plan with regard to the new ripple districts which will be necessitated by the adoption of plaintiffs' majority-black districts.*

4. Defendants are instructed to file with this Court, within one week of the date of the entry of this Order, a final plan including a detailed description of both House and Senate Districts, with maps attached, in accordance with paragraph 3 of this order. The plan shall be submitted to counsel for plaintiffs for their approval as to form, and shall, when submitted, bear the approval as to form of counsel for

plaintiffs and counsel for defendants. The signatures of counsel evidencing this approval as to form shall not be construed as a waiver of any objections that have been previously preserved.

5. Defendants, and each of them, are hereby permanently restrained and enjoined from using, giving effect to, or operating under any other plan of apportionment for the Arkansas General Assembly than the one described in paragraphs 3 and 4 of this Order.

6. The Court retains jurisdiction for the purpose of entering such other orders, if any, as may be necessary to effectuate this decree.

It is so ordered.

## ORDER ON CLARIFICATION

### (Filed Feb. 16, 1990)

We have before us a motion for clarification filed on February 13, 1990, by the defendants. Instructions are requested with respect to the meaning of our order entered on February 9, 1990.

The order directed defendants to adopt as a final plan the plan submitted by them on January 16, modified, however, in accordance with plaintiffs' objections with respect to House District 74, House District 75, and Senate District 30 (Senate District 19 in the plaintiffs' listing.) Defendants interpret the order to mean that they must adopt the plaintiffs' plan with respect to H.D. 74, H.D. 75, and S.D. 30 (plaintiffs' S.D. 19), but are not necessarily bound to adopt, as part of the final plan, the "ripple districts" proposed by plaintiffs in their submission of January 17. Plaintiffs, on the other hand, take the position that the final plan must include their entire proposal, including the "ripple districts."

Our order of February 9, 1990, is not completely clear in this respect, and it should be amplified. So long as H.D. 74, H.D. 75, and S.D. 30 (S.D. 19 in the plaintiffs' listing) are adopted in a manner fully consistent with plaintiffs' objections, both the law and the purpose of our order will be satisfied. What the "ripple districts" should be is the kind of political decision

that should be left to the Board. The Board should be left free to adjust the ripple effect in accordance with its own best judgment. When we entered our order of February 9, 1990, we were not aware (because none of the parties had told us) that the plaintiffs' plan included ripple effects that would adversely affect incumbent legislators who were not within the target zone, so to speak, of the case. Whether, and to what extent, these legislators should be affected is a matter for the Board of Apportionment, not for the Court.

Accordingly, the motion of defendants for clarification is granted, and paragraph 3 of our order entered February 9, 1990, is modified by adding thereto the following sentence: "So long as plaintiffs' plan with respect to these three districts is adopted in full, the Board is free to adopt its own plan with regard to the new ripple districts which will be necessitated by the adoption of plaintiffs' majority-black districts."

It is so ordered.

## OPINION ON RECONSIDERATION

### (Filed March 5, 1990)

ARNOLD, Circuit Judge.

■ We have before us defendants' motion for reconsideration, filed on February 16, 1990. The motion requests that Senate District 30 (District 19 in plaintiffs' numbering system), as described in our order of February 9, 1990, be modified. The modification would increase the black voting age population (BVAP) of this District from 61% to 62%. It would also change the boundary lines of the District in such a way as to prevent two incumbent white senior Senators from being placed in the same district. Plaintiffs have responded to the motion. Their response, filed February 23, 1990, does not take a clear position on the merits of the motion.

■ The motion is granted. From the point of view of the rights of the plaintiffs under the Voting Rights Act, SD 19 as modified in accordance with defendants' latest proposal would actually be superior to SD 19 as prescribed in our order dated

February 9. The motive behind defendants' motion may well be, as plaintiffs suggest, the simple desire to protect white incumbents from political damage, but we are not for that reason persuaded that the motion should be denied. Continuity of representation, which is a sort of euphemism for protection of incumbents, is not an unlawful consideration, so far as the Voting Rights Act is concerned, so long as the equality of political opportunity that the Act protects is ensured. If plaintiffs' rights are fully protected, whether, and, if so, to what extent, incumbent senators should be helped or hurt is a political consideration wholly within the competence of the political body constituted by State law to handle it, in this instance the Board of Apportionment.

We confess to some disappointment at having to address these matters piecemeal. Defendants could well have brought to our attention all of their concerns, including alternative proposals, before entry of our order of February 9. We do not believe, however, that it would be appropriate to deny their motion for this reason. These matters are important, politically as well as legally, and we believe that we should defer to the constituted authorities of the State unless to do so would violate plaintiffs' federal rights. For reasons already explained, we do not believe that the granting of this motion would violate such rights.

Accordingly, the motion for reconsideration will be granted, and our order of February 9, 1990, as initially modified on February 16, 1990, will be further modified by adopting defendants' latest proposal for Senate District 30 (numbered 19 by the plaintiffs).

We are filing today an amended and substituted order, embodying all of our actions to date. This order finally disposes of the Voting Rights Act phase of this case.

It is so ordered.

EISELE, Chief District Judge, dissenting.

(Filed March 5, 1990)

If I had voted to approve the plan on February 9, 1990, I would agree to grant the motion for reconsideration and approve the modification requested by the defendants. But, since I find no justification for the supermajority districts mandated by this Court, I cannot agree to the new proposal which increases the black VAP from 61% to 62%. See my dissenting opinions.

## FINAL ORDER WITH RESPECT TO THE CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT

(Filed March 5, 1990)

ARNOLD, Circuit Judge and GEORGE HOWARD, Jr., District Judge.

In accordance with the opinion filed today, it is CONSIDERED, ORDERED, ADJUDGED, and DECREED as follows:

1. The motion of James Wilburn, Christine Brownlee, James Walter Adams, Louise Evans, and the Rev. Robert Nelson for leave to file objections to remedial plans and to file alternative remedial plan, or in the alternative, to intervene as parties plaintiff, is denied.

2. The motion of the defendant Bill Clinton for leave to file memorandum of fact and law in support of an alternative remedy plan is granted.

3. Defendants are instructed to adopt, as the plan of apportionment of the Arkansas General Assembly in effect henceforth and until the adoption of a new plan following the 1990 Census, the plan submitted by the Board of Apportionment on January 16, 1990, modified, however, in accordance with plaintiffs' objections with respect to House District 74 and House District 75, and in accordance with the Board's plan with respect to Senate District 30 submitted on February 16, 1990.

4. Defendants have filed with this Court, on February 16, 1990, a final plan, including a detailed description of both House and Senate Districts, with maps attached. They subsequently filed corrections—dealing with exact placement of district lines—on February 26, 1990. The corrected plan has been approved as to form by counsel for plaintiffs and counsel for

defendants. The signatures of counsel evidencing this approval as to form shall not be construed as a waiver of any objections that have been previously preserved. This final plan carries out the direction contained in paragraph 3 of this order, except for the most recent modification of Senate District 30.

5. Defendants, and each of them, are hereby permanently restrained and enjoined from using, giving effect to, or operating under any other plan of apportionment for the Arkansas General Assembly than the one described in paragraphs 3 and 4 of this order, provided, however, that this plan is hereby modified in respect of Senate District 30, in accordance with our opinion filed today.

6. The Court retains jurisdiction for the purpose of entering such other orders, if any, as may be necessary to effectuate this decree.

It is so ordered.

### ORDER ON MOTION FOR STAY

(Filed March 5, 1990)

ARNOLD, Circuit Judge, and
GEORGE HOWARD, Jr., District Judge.

The motion of defendants for stay pending appeal is denied.

Judge Eisele would grant the motion for stay pending appeal on the basis of the views he has expressed in the various dissenting opinions he has filed in this case.

It is so ordered.

EISELE, Chief District Judge,
dissenting (Remedy Phase).

(Filed March 6, 1990)

Having dissented from the majority's holding that plaintiffs at the trial of this cause established violations of Section 2 of the Voting Rights Act, *see Jeffers v. Clinton*, H–C–89–004, slip op., (E.D.Ark. January 26, 1990) (Eisele, J. dissenting), I naturally do not join the majority's latest order adopting a new apportionment for the Arkansas General Assembly for the obvious reason that I do not believe, for reasons previously stated, that plaintiffs are entitled to any relief. However, I write separately here because the majority's order of February 9, 1990, adopting a remedial plan takes positions with respect to which I am in fundamental disagreement, and as to which I would have dissented even if I had agreed that plaintiffs should have prevailed during the Section 2 liability stage of this lawsuit.

First, I believe the majority exceeds the bounds of judicial discretion by not deferring to the Board of Apportionment's judgment with respect to the proposed new House and Senate districts. More directly, the majority's position that the defendants' proposed remedy is inadequate because it fails to create legislative districts in which black voters will constitute supermajorities of the population, is, in my opinion, unconstitutional and in violation of the Voting Rights Act's clear rejection of guaranteed proportional representation. To the extent that such supermajority districts *may lawfully be* created under certain circumstances, plaintiffs have failed to establish a proper factual or legal basis for doing so here.

### I

I need not detail the plaintiffs' specific challenges to the defendants' proposed remedial plans or the other objections filed thereto by potential intervenors. The only question in this phase of the lawsuit is whether to approve defendants' proposed plan or to sustain plaintiffs' objections thereto. The districts in controversy are newly created House districts 74 and 75 and a Senate district covering several counties in the Delta region, which plaintiffs designate SD 19, and defendants designate SD 30.[1] Plaintiffs object to the boundaries of these districts developed by the Board of Apportionment because each would have

---

**1.** Plaintiffs also took exception to the Board's proposed Senate District 27, but the majority nevertheless approved same. Although I agree with my brothers, as to this district, I find their explanation for accepting same anomalous and completely inconsistent with their handling of the other challenges. *See infra.*

black voting-age populations (VAP) below 60 percent. Specifically, the Board's proposed House districts 74 and 75 would have black VAP's of 58% and 56% respectively, while the Board's SD 30 would have a black VAP of 55% and the added complication (when viewed from the perspective of the plaintiffs) of having a white incumbent. The plaintiffs' proposed districts create black VAP's of 63% for HD 74, 64% for HD 75 and 60.5% for the Senate district. [Note: The overall black population figures for these districts (i.e., not limited to those of voting age) range from 65% to 70%.]

In sustaining the plaintiffs' objections and adopting their plan for these districts, the majority concluded that while the Board of Apportionment's proposal is entitled to some deference, such deference is outweighed, and the defendants' plan rejected, because the Board's proposed remedy would have been "unlawful at the liability stage of this case." Majority op. at 1199. The majority concludes that the Board's House district 74 and 75 and Senate District 30 would have been unlawful because "they are (1) below 60% BVAP and (2) easily expanded without sacrificing principles of compactness and contiguity." *Id.* I do not agree that the first proposition accurately reflects the law, and, even were it to accurately reflect the law, I do not agree that a factual basis for its application will be found in this record. Nor do I believe that the peculiar facts of this case support the second proposition.

## II

Before reaching my more fundamental disagreement with the majority's contention that a state is under some duty by virtue of the Voting Rights Act to create supermajority black districts, it must be mentioned briefly that the plaintiffs' proposed remedial plan cannot be accurately characterized as a simple expansion of district boundaries which are as compact and contiguous as those districts proposed by the Board of Apportionment.

Plaintiffs' alternative plan creates a number of oddly-shaped House districts, the worst being the inverted-"S" configuration of the boundaries for HD 74. If one were to travel in a perfectly straight line, he or she could enter and exit this district no less than eight times as the district cuts through townships and municipal boundaries across three counties in an awkward effort to capture sufficient black residents to comprise a supermajority of 63% black VAP.

A proposed district is sufficiently compact if it retains a natural sense of community, and is not so convoluted that its representatives could not easily tell who actually lives within the district. *East Jefferson Coalition v. Jefferson Parish*, 691 F.Supp. 991 (E.D.La.1988). That standard has not been met here. It would be difficult to envision a more bizarre and confusing district than the one proposed by plaintiffs (and adopted by the majority of the judges on this court) for HD 74 and the resulting adjacent districts. For this reason alone, this part of plaintiffs' proposed remedy should be rejected.

## III

It is my opinion that the primary obligation to comply with the Voting Rights law in this redistricting case is upon the defendants, the members of the Board of Apportionment, who, under the Constitution and laws of the State of Arkansas, are charged with the duty of legislative redistricting after each decennial census. The Court should not take over or assume this responsibility except as a last resort. Rather, the Court should direct the defendants to comply with the law as declared in the majority's decision on the liability issues. Therefore, I found myself in agreement with the following statement in the majority's earlier opinion entered December 4, 1989:

> They [the defendants] are the authorities charged by state law with the responsibility of drawing a plan of apportionment, and they should also bear the primary responsibility for conforming the present plan to the requirements of federal law. They are closer to and more familiar with all of the many factors,

political, demographic, and social, that deserve to be considered.

*Jeffers v. Clinton*, slip op., at 50–51.

The latest decision of the majority ordering into effect a remedial plan, however, reveals that the Court has given little more than lip-service to this important principle.

Deference to a legally constituted state agency such as the Board of Apportionment means more than just symbolic or formalistic acknowledgement of that body's station and authority. Deference in this context should mean that there is a strong, though rebuttable, presumption in favor of the Board's plan, which should not be cast aside without adequate proof that the Board's proposed remedy is statutorily or constitutionally infirm. Such a presumption is especially valid in cases such as this, where there has been no finding that the Board has acted with invidious intent or in some other manner that would give the Court reason to doubt its good faith. The principles controlling judicial review of plans developed in response to findings of violations of Section 2 are well summarized by the court of appeals in *McGhee v. Granville County*, 860 F.2d 110 (4th Cir.1988).

> Where, as here, a court has properly given the appropriate legislative body the first opportunity to devise an acceptable remedial plan, the court's ensuing review and remedial powers are largely dictated by the legislative body's response. If the legislative body fails to respond or responds with a legally unacceptable remedy, "the responsibility falls on the District Court," to exercise its discretion in fashioning a "near optimal" plan. Where, however, the legislative body does respond with a proposed remedy, a court may not thereupon simply substitute its judgment of a more equitable remedy for that of the legislative body;

it may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place. If the remedial plan meets those standards, a reviewing court must then accord great deference to legislative judgments about the exact nature and scope of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions.

*Id.*, 860 F.2d at 115 (citations omitted).[2]

The majority almost casually concludes that the Board's proposed remedy for the questioned districts would violate Section 2 because it fails to create districts that have supermajorities of 60% or more of black voters. I know of no case that has held that the failure of a board of apportionment to create supermajorities is *per se* violative of the Act. Furthermore, it is my opinion that Section 2 does not require, or permit, the intentional creation of supermajority black VAP legislative districts in developing redistricting plans, or as a remedy for violations of Section 2 in redistricting cases, absent a finding: (1) that the failure to form such districts would result in a diminishment or retrogression of black voting power based upon established historical facts, or (2) that unusual and compelling local circumstances, independent of race, justify such a "politically safe" district or districts. The gerrymandering of boundaries for the sole purpose of creating supermajority districts with no such underlying predicate violates Section 2's proviso "that nothing in this section establishes a right to have members of a protected class

---

**2.** Accepting these principles I would have proceeded differently from the majority in developing the remedy in this case. After the Board filed its proposed remedial plan, I would have entered an order directing the plaintiffs and any other interested party to show cause why the Board's proposal should not be accepted and adopted by the Court. I would then have set a hearing, approximately ten days off, and directed that any affected non-parties could seek permission to intervene at the remedy stage if he or she filed an appropriate motion together with specific objections to the Board's plan not later than the scheduled date of the hearing. After the hearing, I would have promptly dealt with the objections raised. If no one convinced me that the Board's plan did not meet the requirements of the law, and if my own independent review thereof revealed no such problem, I would have accepted and approved it.

elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). I further conclude that if Section 2 were interpreted to require such supermajority black VAP districts, then Section 2, as so interpreted, would be unconstitutional. But, I emphasize, Section 2 can not be so interpreted. It speaks only in terms of "equal opportunity". I submit that "equal opportunity" may not be interpreted to mean "unequal opportunity" or "preferential or superior opportunity".

The majority rejects certain of the Board's proposed solutions because it says that those districts would have violated Section 2 if they had been so created in the 1981 apportionment. I could not disagree more. Indeed, it is my view that the plan proposed by the plaintiffs, and ordered into effect by the majority here, since it is not supported by findings of retrogression or unusual and compelling local circumstances, does itself violate Section 2 because that plan "packs" and concentrates black voters into a few districts at the expense of black voters and black voting power in the adjacent districts. It is no answer that the black plaintiffs want it that way, or that they are not complaining about the creation of such supermajority districts. *See generally* A. Thernstrom, *Whose Votes Count? Affirmative Action and Minority Voting Rights* (1987). The law in this area does not, or should not, depend on the personal predilections of the parties. This should be clear enough if for no other reason than the obvious one: not all legitimately interested people are parties to these redistricting cases. Those non-parties have had no opportunity to express their "druthers." This is true not only of white voters who are placed in superminority situations but even more cogently so for those black citizens who will, as a result of such packing, be forced to live in districts where the percentage of black VAP has been *reduced*—often significantly reduced.

When I say that the plan of the defendant Board should, at the remedy stage, be respected and treated deferentially by the Court, I do not mean that it should be accepted uncritically. If a legislative body should choose to create supermajority districts without making a finding, supported by evidence, that the absence of such districts would have a retrogressive effect or that unusual and compelling local reasons justify such action, the Court should strike down such a plan as being contrary to Section 2 and the Constitution even if no party to the lawsuit objects thereto. The Court has an independent role in public interest lawsuits such as this to see to it that the law is followed.

In its opinion on remedy, filed February 9, 1990, the majority states:

> The law requires equal opportunity. It does not require proportional representation, or that black political superiority be ensured by artificial means. On a strictly numerical and quantitative view of equality, any district with a BVAP [black voting age population] of 50% or higher would be *per se* lawful. We think the Voting Rights Act means something more than this. Suppose two people are in a race, and one of them has had to run the first three laps with a 100–pound weight on his back. Suddenly it occurs to the referee that this is unfair. Something must be done to correct the injustice. Is it corrected just by removing the weight from the disadvantaged runner for the *last lap*? Of course not. If no more than this is done, equality of opportunity is nothing but an empty promise, a form of words better left unsaid by honest people. Past injustice, especially centuries of it, cannot be ignored. In Justice Blackmun's elegant phrase, "[i]n order to get beyond racism, we must first take account of race." *University of California Regents v. Bakke*, 438 U.S. 265, 407 [98 S.Ct. 2733, 2807, 57 L.Ed.2d 750] (1977) (separate opinion).

> It was just this reasoning that led this Court, less than two years ago, to hold unanimously that something on the order of a 60% BVAP is required to remedy a vote-dilution violation of the Voting Rights Act. *Smith v. Clinton*, 687 F.Supp. 1361, 1362–63 (E.D.Ark.) (three-judge court), *aff'd mem.*, [488 U.S. 988], 109 S.Ct. 548 [102 L.Ed.2d 576] (1988).

Majority op., at 1198. This quotation provides the means to clearly illustrate my fundamental disagreement with the majority. It starts with what I believe to be correct observations about Section 2 of the Voting Rights Act, to wit: "The law requires equal opportunity. It does not require proportional representation, or that black political superiority be ensured by artificial means." But it concludes by holding that: "something on the order of 60% BVAP is required to remedy a vote-dilution violation of the Voting Rights Act." Am I unfair in paraphrasing it thusly: "The law requires equal opportunity for blacks which we interpret to mean unequal, preferential opportunity for blacks"? Can it be interpreted otherwise?

Somewhere between the opening and closing quoted statements we should find the basis for this complete reversal—this complete, one hundred and eighty degree, turnaround. That is, one would expect to find there some rationale that would support this abrupt transition. If so, it can only be the "two people in an on-going race" analogy. I suggest that the "on-going race" analogy is inapposite. And yet I find the handicapped racer metaphor to be useful.

Section 2 and its remedies were indeed intended by the Congress to remove those "100–pound weights" (translate: poll taxes, literacy tests, unfair registration laws, etc., etc.) from the backs of blacks and language minorities. The purpose was, and is, to provide "equal opportunity"—the very language of Section 2—and to make all races (here political races) fair and equal. Each election is a new race. We do not solve the problem of discrimination by transferring the 100 pound weights from the backs of blacks to the backs of whites. We do not solve the problem of discrimination against one group by discriminating against another group. And, yet, is it not clear that that is exactly what the majority is doing in this case with its "supermajority" theories?

I take sincere umbrage with the majority's suggestion that "honest people" should not disagree with its views on this issue. To the contrary, honest people—and honest judges—are duty-bound to speak out when they do disagree on such momentous issues.[3] I do not doubt for a moment the sincerity of the majority. This case raises issues upon which there can be honest disagreement.[4] I speak out because I

3. Justice William Brennan's remarks made earlier this year while addressing a bar group in New York make the point quite eloquently. He is reported to have said:
   Where significant and deeply held disagreement exists, members of the court have a responsibility to articulate it.
   &ast; &ast; &ast; &ast; &ast; &ast;
   I do not mean to suggest that one has a duty or right simply to make noise. What I am saying is that all of us—judges, lawyers, students, teachers, factory workers, bankers—must recognize values which are so important to us that we cannot remain silent if and when we feel those values threatened.
   &ast; &ast; &ast; &ast; &ast; &ast;
   Writing [a dissent] is not an egoistic act—it is duty. Saying, "Listen to me, see it my way, change your mind," is not self-indulgence—it is hard work that we are not permitted to shirk.
   Justice Brennan recognized that dissents can sometimes strain collegiality and bruise feelings, but he emphasized the value and roles of dissents as stated in the following report of his remarks:
   —To offer a corrective, "in the hope that the court will mend the error of its ways in a later case."

   This function reflects the conviction that the best way to find the truth is to go looking for it in the marketplace of ideas. It is as if the opinions of the court—both for the majority and the dissent—were the product of a judicial town meeting.
   —To emphasize the limits of the majority decision, "a sort of damage-control mechanism."
   —To express the conscience of the individual justice, a category Brennan called "the most enduring dissents."
   These are the dissents that ... seek to sow seeds for future harvest. These are the dissents that soar with passion and ring with rhetoric. These are the dissents that, at their best, straddle the worlds of literature and law. Would that one could meet such standards!

4. Only slightly beneath the surface of this argument we find the turmoil of controversy in intellectual circles over the form through which we should express our democracy. Shall we express our pluralism and diversity through the political separateness of some form of fragmented "participatory democracy" structured in the form of racial, ethic or religious enclaves or can we be "one Nation," politically, and nevertheless preserve our invigorating diversity? The Founding Fathers put their faith in the latter

believe I am right and my brothers are wrong.

What principle is more important in our national life than the principle of political equality? If there is any area where race-based, or language-based, preferences—affirmative action, if you will—have no place, it is, I suggest, in the political arena. Congress did not intend to create such preferences. And, if it should choose to pass legislation creating such preferences, that legislation would, in my opinion, be unconstitutional. Justice Blackmun's "elegant phrase" should not be seized upon or distorted in an attempt to justify court-ordered political discrimination. Whatever latitude may be constitutionally granted to voluntary affirmative action programs in other areas, our political life should be free from discriminatory preferences.

We do not "get beyond racism" in the political sphere by creating conditions which tend to perpetuate racial separateness. If unintentional violations of Section 2 require the creating of majority VAP black legislative districts, then any increment beyond simple majority status must, in my opinion, be justified (See discussion above). This "equilibrium remedy" would have the additional merit of necessitating, or at least not foreclosing, coalition building, which, in turn, would reduce the significance of racial politics over time. But when black VAP figures of over 60% are required—as the majority has done here—there will be no need, and therefore no incentive, for the black majority to reach out to their white fellow citizens, that is, to "get beyond racism."

One expects the response, "So what is new? Whites have held such majority status over blacks for years and still do almost everywhere in this nation. Why is that situation all right and this all wrong?"

The answer is simple. Until racial polarization occurs, race is not central in the political processes of America. Neither is religion or language. We may be Democrats, Republicans, members of "Third Parties," or Independents. Rational political controversy is shaped by ideas, issues, self-interest, and the perceived merits of the candidates. Black makes no more difference that German or Irish; white than Asian; Christian than Jew or atheist. Yes, our backgrounds (including our racial identities), economic circumstances, political philosophies, and even religious beliefs may affect our politics but, overall, the emphasis is on rational politics. The influence of minority viewpoints in such a mix can be dramatic. And the racial politics that remain—and I recognize that our nation, despite much progress, is not yet beyond the evil and sickness of racism—tend to be submerged over time by the more compelling interests that characterize rational political dispute. Most important, it is not the law that is creating or supporting the racial politics that continues to exist. The law should help us get beyond race. The Congress has done its part by mandating equal opportunity in the political arena. It is wrong for the courts to go beyond Congress' mandate by forcefully creating conditions that reward racial polarization and encourage its perpetuation.

IV

The panel majority's manner of handling proposed SD 27 and the five unchallenged black-majority House Districts (38, 80, 83, 88 and 100) is revealing. All of the proposed districts have black VAPs below 60%. With respect to the House districts, their opinion states:

> [B]ut they are not for that reason unlawful. Plaintiffs have not objected to them, presumably because there is no practical way to increase their BVAP

view and, I suggest, over 200 years of expanding our democracy—continuing our revolution, if you will—validate the wisdom of their choice. In my opinion, majoritarian democracy is the essence of the "republican form of government" which is guaranteed to the states by Article IV, Section 4, of the U.S. Constitution. Under this view individual citizens are protected from the

potential tyranny of the majority by specific constitutional provisions such as those contained in the Bill of Rights. In other words, each of us are guaranteed some space that even the majority may not intrude upon. Otherwise the majority rules. But this view has never been established by the U.S. Supreme Court. So the debate rages on.

while still meeting reasonable standards of compactness and contiguity.

Majority op., at 1199.

Note that the majority struck down the Board's remedial plan as all of the districts challenged by the plaintiffs save SD 27 on the ground that those districts "would have been held unlawful at the liability stage of this case, simply because they are (1) below 60% BVAP and (2) easily expanded without sacrificing principles of compactness and contiguity." Since the five non-challenged House districts are also below 60% BVAP, one would assume that they too would be unlawful at the liability stage *if* they could be expanded without sacrificing principles of compactness and contiguity. But the majority does not study those five districts to see if they could be so expanded. Rather, it "presumes" that they could not be. It draws this inference from plaintiffs' behavior in failing to object to those districts. The effect is to put full control in the hands of the plaintiffs. If they are satisfied, the Court apparently will be. There is no suggestion that the Court has an *independent duty* to examine the various proposals in order to determine if they meet the requirements of the law. So, again, I find myself in fundamental disagreement as to the responsibility of the Court and the approach taken to resolve the issues presented.

And the manner in which the majority handles the Board's proposal for SD 27 is even more revealing. The Board's proposal called for a BVAP of 58%. The plaintiffs objected and submitted their own proposal calling for a district with a BVAP of 61%. Note the majority's explanation for accepting the Board's proposal:

> Plaintiffs point out, and it is true, that a higher BVAP in SD 27 could have been obtained simply by adding certain portions of the City of Pine Bluff to the district instead of a largely white township, Cane Creek, located in Lincoln County. The Board articulates no reason for the selection of Cane Creek over the suggested portions of Pine Bluff, but we do not believe this is fatal to the Board's position. As noted above, the Board, as the regularly constituted authority for this kind of decision, is entitled to some deference. If it creates a district in which, in practical terms, black voters have an equal opportunity, we do not think it should be faulted for failing to give black voters an additional edge.

Here we again take our cue from *Smith v. Clinton, supra.* There, a 60.55% BVAP district, in which an incumbent white State Representative resided, was held to comply with the law fully. We think a 58% BVAP district with no white incumbent is the equivalent in practical political terms. The opportunity to run for an open seat is worth at least two or three points. This is especially true when we consider that the white incumbent in question, if SD 27 had been drawn to include his residence, would have been a prominent State Senator who has recently been elected Chairman of the Democratic Party of Arkansas.

So the majority's position that 60% BVAP is required unless that objective cannot be reached without sacrificing principles of compactness and contiguity is completely undercut here. The panel majority admits that the Board could have expanded the district's BVAP to above 60% "simply by adding certain portions of the city of Pine Bluff ... instead of a largely white township...." And the panel majority further acknowledges that the Board "articulates no reason" for its decision not to do so. So much for the stare decisis effect of *Smith v. Clinton*!

The majority states that the failure of the Board to draw the district so that it had 60% BVAP or more (even though it could have done so without sacrificing principles of compactness and contiguity) is not "fatal" to the Board's position because—hear this—the Board's decision is entitled "to some deference." In so many words, the majority states: "If it [the Board] creates a district in which, in practical terms, black voters have an equal opportunity, we do not think it should be faulted for failing to give black voters an additional edge." Precisely! Why should not this rationale have caused the majority to accept *all* of the Board's proposed districts?

I suggest that the panel majority vacillates in its opinion between a rigid supermajority requirement which it applies to three of the challenged districts and a flexible standard by which it judges SD 27. We are told that the Board drew SD 27 to exclude the residence of the white incumbent, and "we think a 58% BVAP district with no white incumbent is the equivalent in practical terms" of a 60% plus BVAP. "The opportunity to run for an open seat is worth at least two or three points."

Is this not "ad hocery" and judicial subjectivity at its zenith? But such inconsistency must be expected if one allows himself to depart from the "equal opportunity" language of the Act.

## V

Aside from these fundamental disagreements with the majority, it must be acknowledged that the 60% figure has worked itself into our voting rights jurisprudence[5] as a measure of what constitutes an "effective majority" of black voters. Indeed, the majority states, because this Court in *Smith v. Clinton,* 687 F.Supp. 1361 (1988), *aff'd mem.,* 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988), applied such a rationale at the remedy stage after striking down the at-large system at issue there, that we are bound by the principle of stare decisis to accept that view in this case. Acceptance does not require a judge to refrain from criticizing the view. Furthermore, the *Smith* explanation of the supermajority principle makes it clear that there is no basis for its application here.

One of the most detailed discussions of the use of so-called supermajority districts appears in *Ketchum v. Byrne,* 740 F.2d 1398, 1410–18 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), which was followed by the district court in *Smith v. Clinton,* and by the majority here.

In *Ketchum,* after concluding that the districting of aldermanic wards in Chicago discriminated against black and Hispanic voters in violation of Section 2, the trial court ordered the re-drawing of district boundaries so that the new lines would provide plaintiffs a majority in certain wards, but expressly rejected "the rule of thumb ... that 65 percent of the minority is necessary to control a ward, or to put it another way, to give the voters in that ward a fair opportunity to vote for a candidate of their choice." *Id.,* 740 F.2d at 1411. The district court then rejected the use of any majority greater than 50 percent of the VAP as a threshold for determining whether blacks or Hispanics constituted an "effective" majority in a ward. *Id.*

The Seventh Circuit reversed this portion of the district court's findings and remanded the case for additional proceedings on the remedy specifically to consider the supermajority benchmark in developing a remedial plan. As the majority points out here the 60%–65% figure was developed originally not in Section 2 cases such as this one but by the Justice Department in Section 5 "preclearance" cases.

> The figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15%. This leads to a total target figure of 65% of total population. Obviously if voting age population statistics are used 5% would drop out of the formula, leaving something in the vicinity of 60% of the voting age population as the target percentage.

*Id.,* 740 F.2d at 1415.

In this case then, the first applicable target figure for "effective" majorities under such a rationale would be 60% since both plaintiffs and defendants have used voting-age populations (VAPs) in calculating the racial composition of each district. However, plaintiffs' proposed House districts 74 and 75 would have even higher black VAPs than the administratively-created 60% figure.

---

**5.** See Thernstrom, *Whose Votes Count,* Chapter 8, "Detours around the Law," pages 169–176 for the role of the Civil Rights Section of the Department of Justice in developing the ideas concerning supermajority black legislative district.

But even *Ketchum* does not give these figures presumptive effect. The court merely said (wrongly I believe, but accepted for purpose of this discussion) that the district court had to take into account evidence of low minority registration and turn-out when using its equitable discretion to fashion a remedy. *Id.*, at 1414–15. And the court noted:

> [E]merging changes in sociological and electoral characteristics of minority groups and broad changes in political attitudes may substantially alter, or eliminate, the need for a corrective. The 65% figure, in particular, should be reconsidered regularly to reflect new information and new statistical data.

*Id.*, at 1416 and n. 21.

*Evidence* of low-voter turn-out and registration is lacking in this case. In substitution, plaintiffs have argued that black turn-out and registration were "likely to be below" that of whites [6], and then attempted to shift the burden to defendants to prove otherwise. However, comparative registration figures among blacks and whites were not introduced into evidence in this case. Nor can such figures regarding turn-out be extrapolated with any degree of certainty given the age of the census data upon which all such figures depend and the limited information about pertinent elections. Similarly, it is impossible to tell with any precision greater than that of a hunch whether the participation of black voters has changed since the 1981 apportionment. Thus, even assuming that in fashioning a remedy for voting rights violations a simple majority can be augmented to account for lower participation rates among black voters, there is no factual basis for doing so here.

It would also seem reasonable, if one follows the Seventh Circuit's approach, to take into account estimates of white "crossover" votes in previous elections within the affected areas since such "crossover" potential may be said to already augment any simple majority created by the proposed re-districting plans. *Thornburg v. Gingles*, 478 U.S. 30, 55–57, 106 S.Ct. 2752, 2768–70, 92 L.Ed.2d 25 (1986) required con-

---

**6.** This is the same rationale followed, erroneously I believe, by the Eighth Circuit panel majority in *Whitfield v. The Democratic Party of Arkansas*, 890 F.2d 1423 (8th Cir., 1989). What information we do have suggests that blacks and whites are registering in approximately the same proportion to their voting age numbers. In my earlier dissenting opinion, I stated my position that low black registration rates and low black election turnout rates should not be considered if there exist no barriers to registration or voting. Here I make the point that there was, in any event, inadequate evidence in this record of low black registration or turnouts. Ms. Thernstrom in her book *Whose Votes Count?* shows that the Department of Justice and the courts have persisted even in situations where the record disclosed that blacks registered at the same or higher rates than whites:

> Registration starts the electoral process, and minority citizens plainly lack an equal opportunity "to elect representatives of their choice" if they cannot register. Literacy and understanding tests have been permanently banned, but even without them, the Senate criteria suggest that a history of discrimination and continuing economic inequality may serve to screen potential registrants and voters on the basis of race by depressing minority participation rates. Clearly, though, in jurisdictions where black registration and turnout rates are as high as those of whites, such inequalities are not keeping blacks from the polls.

However obvious this point would seem, plaintiffs' attorneys and the courts often dispute it. By 1980 blacks in Norfolk, Virginia, were registering and voting at a higher rate than whites—a by no means uncommon phenomenon. Nevertheless, in a suit challenging Norfolk's at-large system, plaintiffs' attorneys argued that proof of relatively higher black participation rates did not preclude a finding that socioeconomic disparities between blacks and whites impeded minority electoral participation. In a Lubbock City, Texas, case the district court pointed to past discrimination in areas such as education and employment as evidence of electoral inequality, despite undisputed evidence that minority registration was as high as that of whites. Black registration surpasses white in the entire state of Louisiana, yet in a decision involving congressional districting in New Orleans Parish, the court declared itself "persuaded that the deleterious repercussions of historical discrimination persist in hindering the political access of minorities."

Such statements clearly miss the intended point. In no community is the socioeconomic status of blacks and whites equal, and no southern jurisdiction can claim a history free of racial discrimination. But differences in income and history do not always result in differences in levels of political participation.

sideration of this factor in determining legally significant racial bloc voting, and I can discern no logical reason why it should be ignored if one chooses to follow the "realistic and pragmatic" approach discussed above.

Four counties are most directly affected in this dispute over House and Senate district boundaries: Phillips, St. Francis, Lee, and Monroe. Of these, plaintiffs' experts concluded only in Phillips County were elections consistently so polarized along racial lines that black candidates received virtually no estimated support among white voters. In the other three counties, plaintiffs admitted that white "crossover" was consistently much higher and polarization less clear-cut.[7] In those counties, black candidates facing white opponents received white support ranging from 4.2% to 21.6% according to the double regression analysis estimates. Plaintiffs' Exhibit 3. In focusing solely on black residents in these districts, neither the plaintiffs nor the majority offer any reason for ignoring "crossover" figures in the calculus used to determine an "effective" potential political majority favorable to black voters.

One final, but very important, circumstance that guided the court in *Ketchum* is also absent here. In finding a violation of Section 2, *Ketchum* concluded that under a retrogression analysis, blacks and Hispanics were worse off under the 1981 apportionment than they were under the previous districting plan. Under the 1971 plan, the plaintiffs constituted 65 percent or more of the population in a number of affected wards and these majorities would have carried over but for the fracturing and packing of blacks and Hispanics in the 1981 apportionment. *Id.*, at 1413–14. Consequently, the court reasoned, a plan that held a simple majority to be sufficient to remedy the discriminatory effect of the 1981 apportionment would have actually resulted in a change *"downward* from the pre-redistricting percentage previously

achieved by the minority group rather than one *upward* from the map formulated by the [defendants]." *Id.*, at 1414. In this context, it makes complete sense to say that supermajorities may be permitted, or even required, based on historical circumstances, to prevent retrogression in the political status of blacks.

No analogous circumstance exists in this case. The legislative districts in this lawsuit are geographically much larger, and consequently more heterogeneous in terms of housing patterns than the tiny municipal wards at issue in *Ketchum*. Using counties as the nearest appropriate measure, the 1980 census revealed that blacks constituted bare majorities of between 52.9 to 54.8 percent of the total population in only three of the sixteen counties directly affected by this lawsuit. In the present dispute over an appropriate remedy, two of the state's majority-black counties are implicated: Phillips and Lee. A third county, St. Francis—portions of which would be used to create new House districts 74 and 75 as well as the new Senate district—had a black population of only 46 percent. In terms of voting-age population, blacks were not a majority in any county and only accounted for 45 percent of persons 18 years and older in Phillips, Lee and St. Francis counties combined. *See* Plaintiffs' Exhibit 31, Table 45. Viewed in these terms, it cannot be said that the defendants' proposed districting scheme for these counties results in any retrogression of black voting strength relative to their numbers in the population as a whole. In fact, the Board of Apportionment's creation of districts in these counties with black VAP's of between 55 percent and 61 percent appear to augment and enhance significantly the relative strength of black voters. Absent some showing of retrogression, I believe the majority exceeded the bounds of judicial discretion even under the rationale of *Ketchum* when it rejected the Board's proposed remedy in these districts

---

**7.** I assume *arguendo* the validity of these figures here. However, as previously stated, I believe such statistical models alone represent an inherently flawed method by which to determine racial polarization since they make no effort to correlate any substantive issues in the campaigns preceding each election with the alleged racial animus of white voters. *See Jeffers v. Clinton*, No. H–C–89–004, slip op. at 63–68 (E.D. Ark. January 26, 1990) (Eisele, J. dissenting).

and approved plaintiffs' proposed districts which have even higher—considerably higher—black VAPs.

The avoidance of a remedy that would actually have a regressive effect upon minority voters was critical to the holding in *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), upon which *Ketchum* and *Smith II* as well as plaintiffs here rely for the proposition that the Supreme Court has recognized the use of the 65% or 60% figures as constituting "effective" majorities. Actually, the holding in *United Jewish Organizations* is much narrower. In that case, petitioners were Hasidic Jews in a section of Brooklyn, New York—a county that is subject to the pre-clearance provisions of Section 5 of the Voting Rights Act. In an attempt to develop a plan that would gain Justice Department approval, the state created two additional legislative districts in Brooklyn with 65% black VAP majorities. The apportionment split the Hasidic community, members of which then filed suit alleging that the plan violated the Fourteenth and Fifteenth Amendments. The lower courts and Supreme Court rejected petitioners' claim, and approved the use of racial criteria in apportioning legislative districts lines for the purpose of complying with the Voting Rights Act. *Id.*, 430 U.S. at 162–63, 97 S.Ct. at 1008–09.

First the Court noted such criteria was permissible under its previous holding in *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), which held that the Voting Rights Act does not permit the implementation of a reapportionment that "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *United Jewish Organizations*, 430 U.S. at 158–61, 97 S.Ct. at 1006–08, *quoting, Beer.* The Court explained that in creating a certain number of districts in which blacks were "likely" to

control, New York was doing no more than implementing the non-retrogression principle required in *Beer.* The Court also said creating such supermajority districts in order to comply with Section 5 was permissible where the total number of districts reflected the proportion of the black population in the county. *Id.*, at 166, 97 S.Ct. at 1010.

However, as already noted, the defendants' proposed remedy here would not have a retrogressive effect on black voters in Phillips, Lee or St. Francis counties. Much to the contrary. Unlike the situation in *United Jewish Organizations*, the Board's proposed districts in the affected area would in fact create a black majority of voters that did not already exist in the overall racial composition of those counties. *United Jewish Organizations* merely applied the rule articulated in *Gaffney v. Cummings*, 412 U.S. 735, 752, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973), which provided that "within tolerable population limits" a state *may* "through districting, provide a rough sort of proportional representation in the legislative halls of the State." The defendants proposed remedy does just that. Even though two of the three districts now in dispute do not quite reach the 60% Justice Department "rule of thumb" figure, there is no basis under the facts of this case for not applying the sound policy of judicial deference to the political choices made by the state legislative body charged with the task of apportionment. *McGhee v. Granville County, supra.*[8]

In rejecting the defendants plan, the majority sends a signal that race, (or, presumably, "language minority" status) is to be the dominant, pre-eminent concern in legislative apportioning both now and in the future. Such a pronouncement cannot fit comfortably within the Voting Rights Act's own rejection of guaranteed proportional

---

**8.** My independent review of the local circumstances and considerations which caused the Board to create black VAP districts in excess of a simple majority black VAP (to wit, 55%, 56% and 58%) satisfies me that their departure upward from the "equilibrium figure" was justified.

representation for electoral minorities. 42 U.S.C. § 1973(b). Nor can such a rule be squared with previous case law holding that while a state may consider the preservation of minority group political status in making apportionment decisions, it may also consider other legitimate factors such as compactness, respect for municipal boundaries, preservation of the core of previously existing districts and, in the absence of invidious intent, protection of incumbents. *See Karcher v. Daggett,* 462 U.S. 725, 742, 103 S.Ct. 2653, 2664, 77 L.Ed.2d 133 (1983).

The majority, despite protests to the contrary, accepts wholeheartedly the premise that the Voting Rights Act implicitly requires the adoption of a remedy which not only disassembles the electoral mechanism they have found to effectively discriminate against black voters, but which will also enhance, and all but guarantee, the electoral success of black candidates in certain districts.

By rejecting the Board of Apportionment's proposed remedy and ordering the creation of supermajority black VAP districts, the majority would establish by precedent a rule of law that any apportionment scheme will be open to attack if it does not optimize the political strength of black voters.

Neither the Voting Rights Act nor the Constitution permit this Court, as a remedy, to grant to any group dominant political status. Yet that is clearly the effect of this Court's decision and order of February 9, 1990. I respectfully dissent.