Elbert SMITH, Vickie Miles Robertson, Johnny Mae Williams, Maxine Bohannon, Carolyn Stephenson, Ester Cage, Faye Williams, Darrick Handy, Anthony R. Holmes, Carol Holmes, and Maggie Hall, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Bill CLINTON, Governor of Arkansas, Bill McCuen, Secretary of State of Arkansas, and Steve Clark, Attorney General of Arkansas, In Their Respective Official Capacities and In Their Official Capacities as Members of the Board of Apportionment of the State of Arkansas; Lilburn W. Carlisle, Chairperson of the Arkansas State Committee of the Democratic Party; Tommye S. Givens, Secretary of the Arkansas State Committee of the Democratic Party; Ed Bethune, Chairperson of the Arkansas State Committee of the Republican Party; and Phyllis Kincannon, Secretary of the Arkansas State Committee of the Republican Party, Defendants.

Civ. A. No. LR–C–88–29.

United States District Court,
E.D. Arkansas, W.D.

July 7, 1988.

William L. Robinson, Frank R. Parker, Robert B. McDuff, Samuel Issacharoff,

Lawyers' Committee for Civ. Rights Under Law, Washington, D.C., Ben Thomas Cole, II, East Arkansas Legal Services, West Memphis, Ark., Reginald Robertson, East Arkansas Legal Services, Helena, Ark., Victor Hill, East Arkansas Legal Services, Blytheville, Ark., (John Walker, Little Rock, Ark., of counsel), for plaintiffs.

Frank J. Wills, III, Asst. Atty. Gen., Little Rock, Ark., Kent J. Rubens, West Memphis, Ark., for defendants.

Before ARNOLD, Circuit Judge, HARRIS, Senior District Judge, and WOODS, District Judge.

ARNOLD, Circuit Judge.

On July 1, 1988, this Court entered its final judgment in this vote-dilution case under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. This opinion explains our reasons for the particular form of judgment we have entered.

We had previously held that plaintiffs, black registered voters in Crittenden County, Arkansas, had demonstrated that at-large election of State Representatives from dual-member District 48–49 denied them an equal opportunity to participate in the political process. We ordered that the March 8, 1988, primary election for State Representatives be set aside, and that a plan to divide District 48–49 into separate districts be implemented in time for a special primary election to be held before the November 1988 general election. 687 F.Supp. 1310 (E.D.Ark.1988).

Following this decision, we gave the parties an opportunity to submit their proposals for dividing the District into two similarly sized, contiguous districts. Only the plaintiffs submitted a plan. Our judgment has accepted this proposed plan and ordered it into effect, even though the defendants objected to the high percentage of black voters in the new District 48. We have done so because there is convincing authority that historically disadvantaged minorities require more than a simple majority in a voting district in order to have the Voting Rights Act remedy to which they are entitled—a practical opportunity to elect candidates of their choice.

Under the plaintiffs' proposed remedy, District 48 will have a total population of 23,066, with black residents making up 14,-975 of this number (about 65%). District 49 will have 22,861 in total population, with white residents accounting for 18,567 (81%). In terms of voting-age population, blacks will make up 60.55% of the residents in District 48, representing 8,470 persons out of 13,989. The percentage of blacks of voting age will be less than 16% in District 49, where whites make up 13,008 of the 15,497 people old enough to register to vote.

■ Not only have the defendants declined to submit a plan of their own, but they have chosen not to say whether, given the desired balance of size and population between the districts, it is feasible to create a district that they would find preferable. They simply maintain that any plan affecting only District 48–49 would interfere with the State-wide scheme of apportionment. We rejected this argument as a defense to the plaintiffs' case on the merits, and we do not accept it here as a reason to disapprove the plaintiffs' plan. Defendants also argue that plaintiffs' evidence fails to justify what they call a "supermajority" black district.

We recognize that this Court has an independent obligation to order a remedy that is appropriate to the violation that has been shown. Accordingly, we have carefully examined plaintiffs' plan to see whether it complies with principles of equity and efficacy established by cases under the Voting Rights Act.

■ In shaping a remedy under the Voting Rights Act, this Court must "exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 31 (1982), reprinted in 1982 U.S.Code Cong. & Ad.News 177, 208 (footnote omitted). It is widely understood that "minorities must have something more than a mere majority even of voting age population in order to have a

reasonable opportunity to elect a representative of their choice." *Ketchum v. Byrne,* 740 F.2d 1398, 1413 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). Moreover, the extent to which minorities must outnumber whites in the relevant jurisdiction is a matter of "general acceptance in redistricting jurisprudence." *Id.* at 1415–16 (citing cases).

A guideline of 65% of total population is frequently used, and is derived by supplementing a simple majority with an additional 5% to offset the fact that minority population tends to be younger than that of whites, 5% for the well-documented pattern of low voter registration, and 5% for low voter turnout among minorities. When voting-age population figures are used, a 60% nonwhite majority is appropriate. *Id.*[1]

Defendants suggest that there is no basis for correctives in this case because there was no convincing evidence before the Court of low registration or participation among blacks in Crittenden County. We think this Court is entitled to consider the "generally … lower voter registration and turnout characteristics" of minorities, *Ketchum,* 740 F.2d at 1413,[2] especially when there is nothing to indicate that the general pattern does not apply in Crittenden County, and the factors underlying this pattern exist in great measure in the county.[3] When reliable voting statistics are not available, "judicial experience can provide a reliable guide to action." *Id.* at 1415. A district court may base its remedy on data in the record or use a "uniform corrective." *Id.* at 1419. Further, as plaintiffs point out, the defendants' summary of voting

patterns entered in evidence at trial shows that black turnout as a percentage of total black population was lower than that of whites in every one of the sixty-five contests analyzed, by an average of nine percent. Def. Exhibit 7.

Accordingly, we believe a corrective majority in black voting age population is in order. We adopt the plan proposed by the plaintiffs, which will result in District 48's having a majority black population of 60.55% among residents of voting age. This will give blacks a fair opportunity to elect the candidate of their choice to the Arkansas House of Representatives, and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process.

---

**1.** We are aware that one reason for the 65%-of-total-population-guideline in *Ketchum* is that the case involved a form of Voting Rights Act violation called retrogression, in which there is a decrease in the absolute number of representatives a minority group may expect to elect, 740 F.2d at 1402, and the appellate court thought it equitable to restore blacks to majority percentages approaching those they had before redistricting took place. We do not think this circumstance renders the reasoning of the case inapplicable, because the Court's stated objective was to give the plaintiffs an effective majority in the relevant districts. *Id.* at 1419.

**2.** The Seventh Circuit referred to national voter registration and turnout statistics from the 1980

census to illustrate this circumstance. *Ketchum,* 740 F.2d at 1413 n. 16.

**3.** We think it is reasonable to infer lower registration and participation when, for example, in 1980 fewer than 20% of blacks in Crittenden County over the age of 25 were high school graduates, and almost 60% of blacks in the county lived below the poverty level. The percentages for whites were 61.4% high school graduates and 10.7% below the poverty level. Plaintiffs' Exhibit 2. *See Ketchum,* 740 F.2d at 1413–14 (some of the voter problems stem from low income, low economic status, high unemployment, poor education and high mobility).