M.C. JEFFERS, Al Porter, Evangeline Brown, Clyde Collins, Earl Foster, The Rev. Ellihue Gaylord, Shirley M. Harvell, Linda Shelby, J.C. Jeffries, Joseph Perry, Clinton Richardson, T.E. Patterson, Earnest Simpson, Brian Smith, and Charlie Statewright, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Jim Guy TUCKER, In His Official Capacity As Governor of Arkansas and Chairman of the Arkansas Board of Apportionment; W.J. McCuen, In His Official Capacity As Secretary of State of Arkansas and Member of the Arkansas Board of Apportionment; and Winston Bryant, In His Official Capacity As Attorney General of Arkansas and Member of the Arkansas Board of Apportionment, Defendants.

No. H–C–89–004.

United States District Court, E.D. Arkansas, E.D.

March 8, 1994.

Don E. Glover, Dermott, AR, Perlesta A. Hollingsworth, Hollingsworth Law Firm, P.A., Little Rock, AR, Olly Neal, Jr., Marianna, AR, L.T. Simes, II, Simes & Simes, West Helena, AR, Perda D. Hair, Washington, DC, Julius L. Chambers, Sherrilyn Ifill, Dayna L. Cunningham, NAACP Legal Defense Fund, Inc., New York City, Sheila Y. Thomas, NAACP Legal Defense Inc., Washington, DC, Donna L. Dennis, Debevoise & Plimpton, New York City, Kathleen Bell, Chanc/Probate Judge, First Judicial Dist. of Ark., West Helena, AR, for plaintiffs.

Phil W. Campbell, Paula Jamell Storeygard, Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, AR, for Robert Nelson, James Wilburn, Christine Brownlee, James Walter Adams and Louise Evans.

Tim C. Humphries, Atty. General's Office, Frank J. Wills, III, B. Frank Mackey, Jr., P.A., Little Rock, AR, for W.J. McCuen, Arkansas Bd. of Apportionment and Winston Bryant.

Field Kindley Wasson, Jr., Chief Legal Counsel, Office of the Governor, Frank J. Wills, III, Little Rock, AR, for Bill Clinton and Jim Guy Tucker.

Frank J. Wills, III, Little Rock, AR, for Steve Clark.

Before RICHARD S. ARNOLD, Chief Circuit Judge, EISELE, Senior District Judge, and HOWARD, District Judge.

RICHARD S. ARNOLD, Chief Circuit Judge.

In 1989, this Court found that portions of Arkansas's 1981 state-legislative-redistricting plan violated Section 2 of the Voting Rights Act. *Jeffers v. Clinton*, 730 F.Supp. 196 (E.D.Ark.1989), *aff'd mem.*, 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). In 1990, the Court ordered the State to remedy these violations by creating additional black-majority legislative districts. 740 F.Supp. 585 (E.D.Ark.1990), appeal dismissed on motion of appellants, 498 U.S. 1129, 111 S.Ct. 1096, 112 L.Ed.2d 1200 (1991). Later that year, we approved, with modifications to

some districts, the remedial redistricting scheme proposed by the Arkansas Board of Apportionment. 756 F.Supp. 1195 (E.D.Ark. 1990), *aff'd mem.*, 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). It was this scheme which was used in the 1990 elections, under which a total of twelve black persons were elected to the 1991 Arkansas General Assembly—as compared with four in 1980.

Although we gave our approval to the Board's plan for 1990, we retained jurisdiction over the case to enable the plaintiffs to lodge objections concerning modifications made following the 1990 census. 740 F.Supp. at 602. Some of the plaintiffs did make timely objections to the Board's new plan, which was completed in 1991. Since then, the Pulaski County plaintiffs have settled with the State. We are left with the claims of a group of plaintiffs from East Arkansas, residents of the Mississippi Delta. Their objection is that, in fashioning its 1991 plan, the Board of Apportionment did not go far enough in its efforts to remedy past discrimination. The plaintiffs charge that the Board's plan for the Delta provided for only four House of Representatives districts in which a majority of the voting-age population is black, when five could have been drawn, and created only one such Senate district, when two were possible. Our task is to determine whether the State's redistricting plan violates § 2 of the Voting Rights Act because it fails to create additional black-majority districts. For the following reasons, we uphold the State's plan.

## I.

Under the Voting Rights Act, as amended in 1982, no "standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . ." 42 U.S.C. § 1973(a). In order to prove a violation of the Act, members of the protected class must demonstrate that, as a result of the challenged practice or structure, they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Section 1973(b); *Thornburg v. Gingles,* 478 U.S. 30, 44, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764.

■■■ As a preliminary matter, we note that the plaintiffs have broadly claimed that the law requires the State to maximize a minority group's representation. However, "[t]he Voting Rights Act does not require, invariably and in every instance, that districts be drawn so as to maximize minority political power. Such a result would be akin to a requirement of proportional representation, which the Voting Rights Act itself rejects." *West v. Clinton,* 786 F.Supp. 803, 806 (W.D.Ark.1992) (three-judge court).[1] Likewise, we reject the defendants' claim that it is an absolute defense to a vote-dilution claim that, under the Board's plan, blacks have achieved representation in the legislature which is approximately proportionate to their numbers in the upper Delta. *Gingles* indicates that *persistent* proportional representation is inconsistent with allegations that minority voters have an unequal ability to elect the representatives of their choice. 478 U.S. at 77, 106 S.Ct. at 2780. We doubt whether one election under the Board's existing plan, coupled with one election under the Board's first remedial (pre-census) plan, can be considered the basis for a finding of "persistent" proportionality. Instead, we tend to agree that, although "[i]t is not our goal . . . to draw as many minority districts as possible . . . we should draw as many as can be reasonably done." *DeGrandy v. Wetherell,* 794 F.Supp. 1076, 1091 (N.D.Fla.1992) (Vinson, J., specially concurring), probable jurisdiction noted, 113 S.Ct. 1249 (1993).

■■■ In evaluating claims of vote dilution, the reviewing court is to examine "the impact of the contested structure . . . on minority electoral opportunities on the basis of objec-

---

**1.** The Act states that "nothing in this section establishes a right to have members of a protect-

ed class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

tive factors." *Gingles, supra,* 478 U.S. at 44, 106 S.Ct. at 2763 (citations omitted). The court should consider the factors contained in the Senate Judiciary Committee Report which accompanied passage of the 1982 Amendments. They include:

> 1. [T]he extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;
>
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as a part of plaintiffs' evidence to establish a violation are:

> ■ whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
>
> ■ whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. and Admin.News 177, 206–07.

■ While many or all of the Senate Report factors may be relevant to a claim of vote dilution under the Act, at a minimum, a plaintiff seeking to establish a violation of § 2 must satisfy three preconditions set out in *Gingles:*

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.
>
> \* \* \* \* \* \*
>
> Second, the minority group must be able to show that it is politically cohesive.
>
> \* \* \* \* \* \*
>
> Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ...—usually to defeat the minority's preferred candidate.

478 U.S. at 50–51, 106 S.Ct. at 2766–67. The plaintiffs bear the initial burden of proving these preconditions. *Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1156, 122 L.Ed.2d 500 (1993). In order to assess their claims, the existing plan must be compared to "an ideal electoral system which does not contain the challenged structure." *Brewer v. Ham,* 876 F.2d 448, 455 (5th Cir.1989); see also *Gingles,* 478 U.S. at 88, 106 S.Ct. at 2785 (O'Connor, J., concurring). We must bear in mind, however, that where, as here, a political jurisdiction has responded to a previous judicial finding of vote dilution with a proposed remedy, we may not "simply substitute [our] judgment of a more equitable remedy for that of the legislative body; [we] may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *McGhee v. Granville County,* 860 F.2d 110, 115 (4th Cir.1988) (county's plan for electing

board of commissioners) citing *Upham v. Seamon,* 456 U.S. 37, 42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982).

## II.

■ The parties have submitted this dispute for resolution based on the factual record already established in the case and on several stipulations.[2] These stipulations include maps of the existing Board plan as well as the plaintiffs' proposed plan—the latter representing the plaintiffs' conception of the "ideal" plan. With respect to the Senate Report factors, and the *Gingles* factors, the parties stipulate that this Court has already found that:

A. Arkansas has a long history of official discrimination in voting;

B. Racial discrimination still exists today in the Delta area of Arkansas; it has not completely disappeared.

C. Housing discrimination existed in the State of Arkansas in the past.

D. Neighborhoods in the cities of Eastern Arkansas are generally identifiable as "black" or "white."

E. At least to some extent, voting in Mississippi, Crittenden, St. Francis, Phillips, Monroe, and Lee Counties is racially polarized, i.e., with whites generally voting for whites and blacks generally voting for blacks when white and black candidates run against each other.

F. Historically, blacks have had lower economic status in the state and especially in the Delta area of the state.

G. From Reconstruction through 1972, no blacks were ever members of the Arkansas General Assembly.

H. Not since Reconstruction has a black person been elected to the Arkansas General Assembly except from a district with a majority black voting age population.

I. Overt racial appeals have occurred in campaigns in which a white candidate is running against a black candidate.

J. African Americans are a politically cohesive group in eastern Arkansas.

K. White voters in eastern Arkansas usually vote sufficiently as a bloc to defeat the African American community's choice except when the candidate of choice runs in a district in which African Americans are a voting majority.

Stipulation and Proposed Procedure, 3–4. Of particular significance, in light of the *Gingles* preconditions, are items J. and K., which acknowledge prior findings by this Court that blacks in East Arkansas are a politically cohesive group and bloc voting is prevalent in that part of the State. We see no reason not to accept these two aspects of the plaintiffs' prima facie case as established under *Gingles.* Defendants argue that the plaintiffs should be required to prove anew the presence of bloc voting that usually defeats minority-preferred candidates under the Board's current plan. We reject the Board's contention that the long history of bloc voting resulting in white electoral domination, established earlier in this case, must be proved afresh under the new scheme. The Board's approach to this factor relies on an unduly cramped reading of the parties' stipulations, as well as an overly broad understanding of the requirement that any § 2 violation must be proved anew. Hence, we find that the plaintiffs have met their burden with respect to the second and third *Gingles* factors.

## III.

An additional *Gingles* precondition remains, however: compactness. As Justice O'Connor stated in her concurring opinion, "a court should calculate minority voting strength by assuming that the minority group is concentrated in a single-member district in which it constitutes a voting majority. *Where the minority group is not large enough, geographically concentrated enough, or politically cohesive enough for this to be possible, the minority group's claim fails.*" 478 U.S. at 90, 106 S.Ct. at 2787 (emphasis supplied). In this case, the parties have

---

**2.** We commend the parties for taking this step. Given the exhaustive factfinding which has already taken place in this case, an additional trial would have been a poor use of time. By present-ing us with stipulations, the parties have allowed us to focus on the significant legal issues raised by the case.

stipulated that "[t]he African American population in the upper Delta is sufficiently large to constitute a majority in one additional single-member state house district and one additional single-member state senate district."[3] However, we must further inquire whether such districts can be drawn consistently with applicable requirements.

■ One aspect of compactness is the percentage of minorities in the districts formed by the competing plans. We agree with the plaintiffs that creation of districts in which the minority group comprises a majority of the voting-age population constitutes the preferred remedy under the Act. As another court recently stated, "the language of § 2 and its legislative purposes strongly favor the creation of majority black districts and visible black representation, instead of 'influence' districts, when block voting is racially polarized and there is a history of racial discrimination." *Rural West Tennessee African–American Affairs Council, Inc. v. McWherter*, 836 F.Supp. 453, 466 (W.D.Tenn. 1993) (three-judge court). In the eyes of the plaintiffs, the Board has impermissibly chosen to establish influence districts where majority districts were possible.

However, in the past this Court has ruled that, in fashioning remedies for Voting Rights Act violations, the creation of districts with bare majorities is not enough for a complete remedy. In order to compensate for historically low rates of voter registration and turnout, "minorities must have something more than a mere majority even of voting age population in order to have a

reasonable opportunity to elect a representative of their choice." *Smith v. Clinton*, 687 F.Supp. 1361, 1362–63 (E.D.Ark.) (three-judge court), *aff'd mem.*, 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988), quoting *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). When voting-age-population figures are used, we have found that creating a district with a 60% nonwhite majority provides a sufficient cushion for an effective remedy. *Smith*, 687 F.Supp. at 1363; *Jeffers*, 756 F.Supp. at 1198–99. We have also said that "a 58% BVAP [black-voting-age population] district with no white incumbent is the equivalent in practical political terms" of a 60.55% BVAP district with an incumbent. *Id.* at 1200. To the Board, then, the "influence" districts about which the plaintiff complains, at least in the House, are merely the price of drawing supermajority districts elsewhere.

Comparing the two plans in this case,[4] we note that, for the House, the Board's 1991 blueprint created four majority-black districts in the Delta. Three of those districts are supermajority districts, with 60% or more black-voting-age population ("BVAP"); the fourth district is 56.32% black. For the Senate, the Board created one supermajority district. Altogether, the Board's plan establishes four supermajority districts. The House plan promoted by plaintiffs creates five majority-black districts, but only one of these is a supermajority district. The plaintiffs' Senate plan includes two majority-black districts, one of which is a supermajority district. The plaintiffs' plan, then, creates a

---

**3.** We are prepared to accept this stipulation as fact. The parties also attempted to stipulate that plaintiffs' proposed remedy districts are contiguous. We consider this a question of law, and hence are unwilling to make such a finding based solely on a stipulation. Further inspection confirms that the districts are indeed contiguous in the narrowest sense; whether they are sufficiently contiguous to satisfy *Shaw v. Reno*, —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), will be discussed later.

**4.** The parties' plans include the following majority-black districts, each listed with their respective black-voting-age populations as a percentage of the total population. In addition, we have indicated whether there is an incumbent legislator, by race.

*Board—House: HD 94:* 56.32% (black incumbent); *HD 95:* 63.06% (black incumbent); *HD 97:* 61.95% (white incumbent); *HD 99:* 60.10% (black incumbent).
*Plaintiffs—House: HD 38:* 59.31%; *HD 48:* 62.-67%; *HD 72:* 55.04%; *HD 74:* 58.61%; *HD 75:* 55.24% (black incumbent). Plaintiffs also indicate that in none of the proposed districts is there a white incumbent.
*Board—Senate: SD 22:* 61.91% (black incumbent).
*Plaintiffs—Senate: SD 7:* 58.05% (no incumbent); *SD 22:* 60.18% (black incumbent).
  Maps of the parties' plans are contained in an appendix to this opinion.

total of two supermajority districts, compared with the Board's four.[5]

With respect to the House, the plaintiffs argue that 60% supermajorities are no longer necessary in certain districts, including some now represented by black incumbents. They argue that a majority of 55%–56% is enough where there is no white incumbent. The defendants point out, though, that this represents a change of position. What once was urged, during the first round of this litigation, as essential to allowing blacks to compete in Delta districts (the supermajority district) is now characterized as dilutive of black voting strength. Moreover, the Board adds, when this Court approved the pre–1990–census plan, we actually required the State to modify its plan in order to add additional supermajority districts. It would be perverse, the State contends, for this Court to find that the existing plan violates § 2 when it was prepared in good faith with the intention of complying with our clear supermajority requirements. We agree. Furthermore, just as we think that one election (two, if we include the election under the 1990 plan) is not enough to warrant a conclusion that bloc voting is no longer a significant problem, neither do we think that we have sufficient experience to say that supermajorities are no longer required in the Delta.

The plaintiffs' proposed Senate plan is a different matter. First, the plaintiffs envision a northern senatorial district in Eastern Arkansas with a 61% BVAP, which would encompass the residence of an incumbent black senator. Second, in a southern senatorial district, the BVAP would be 59%. In this district, the plaintiffs point out, there is no incumbent. Therefore, the plaintiffs reason, the below–60% figure is justified. Defendants do not appear to attack the plaintiffs' proposed Senate district on supermajority grounds, as such. Rather, they express

concern that, in order to construct the additional Delta senatorial district, the plaintiffs actually withdraw a substantial number of black voters from a third district (existing SD 8), which is also majority-black. Not only would this reduce the percentage majority in the affected district, but, the Board suggests, also would reduce the size of the affected district so much that it would exceed the maximum variance allowable by the Board's plan under the principle of one person, one vote. These problems, while not fatal in and of themselves, are significant. And the plaintiffs' Senate plan raises other concerns.

The recent Supreme Court case of *Shaw v. Reno* made clear that "reapportionment is one area in which appearances do matter." ――― U.S. ―――, ―――, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993). *Shaw* held that plaintiffs stated a cognizable claim when they challenged, on equal-protection grounds, North Carolina congressional redistricting "so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification." *Id.* at ―――, 113 S.Ct. at 2824.[6] *Shaw* stated that redistricting legislation which is "so bizarre" that it is "unexplainable on grounds other than race," is subject to strict scrutiny under the Equal Protection Clause. *Id.* at ―――, 113 S.Ct. at 2825. An example of such a case, *Shaw* stated, would be where "a State concentrated a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Id.* at ―――, 113 S.Ct. at 2827.

There is no equal-protection challenge involved in the present case. However, it is clear that any plan which the Court would

---

5. The discrepancy may not be quite so large as these numbers suggest, though. Plaintiffs also include in their plans a few districts with BVAP's between 58% and 60%; to the extent which these districts lack white incumbents, they are the functional equivalent of 60%–plus supermajority districts.

6. The suit arose when North Carolina, which is subject to preclearance procedures under § 5 of the Act, redrew congressional districts under orders from the U.S. Department of Justice. North Carolina created a second majority-black district, one stretching hundreds of miles along an interstate-highway corridor, which was the subject of plaintiffs' challenge.

adopt as preferable to the Board's existing plan—a plan which has been structured largely in response to this Court's previous orders—would have to be consistent with the spirit of *Shaw.* We agree with the defendants that several of the plaintiffs' proposed districts are troubling in this regard.[7] Perhaps the most troubling are the plaintiffs' Senate districts. While they are nowhere nearly so unusual in shape as the I–85 district at issue in *Shaw,* the Senate districts are anything but compact, especially striking when compared with the existing SD 22. The plaintiffs' proposed SD 22, the northern district, simply hugs the Mississippi, while the southern district, SD 7, extends a series of long, slender fingers deeply to the west from the River. Both cut across numerous communities and political boundaries. The peculiar shape of these districts, as well as that of some of plaintiffs' House districts, is precisely due to the lack of the compact minority population required by *Gingles.* Because the plaintiffs have failed to satisfy the compactness precondition, with respect

to both the House and Senate, we must reject their claim.

## IV.

We conclude that plaintiffs have failed to prove that the Board of Apportionment's post–1990–census redistricting plan results in less opportunity for black Arkansans who reside in the Delta "to participate in the political process and to elect representatives of their choice." The bottom line is that the black population in this area is simply too widely dispersed for us to hold that the Board has violated § 2 by refusing to draw the additional House and Senate districts which the plaintiffs have requested. We hold that the Board's 1991 redistricting plan satisfies the requirements of § 2 of the Voting Rights Act with respect to the East Arkansas areas which are the subject of the instant challenge. The plaintiffs' objections are dismissed, and judgment will be entered accordingly.

It is so ordered.

---

**7.** This remark is not intended to cast doubt on the validity of the districts in the Board's existing plan. These districts are the result of a judicial decree which has become final, and no one has claimed that they violate the Equal Protection Clause.

Proposed Legislative Plan — Eastern Arkansas
Complete Senate Plan

Proposed Legislative Plan — Eastern Arkansas

Complete House Plan

[Editor's Note: Numbers added for purposes of publication.]

[Editor's Note: Numbers added for purposes of publication.]

Existing Legislative Plan — Eastern Advantage
Area Around Senate District 22

22

[Editor's Note: Number added for purposes of publication.]

EISELE, Senior District Judge, concurring.

I concur in the result reached by my brothers but I disagree with some of their reasons and with much of their legal analysis. Because I consider the issues to be of transcendent importance to our society I have decided to set forth my views in some detail. This concurring opinion carries forward the disagreements I have expressed in numerous dissenting opinions that I have filed during the course of this action.[1]

This case originated as an attack on the 1981 Apportionment Plan adopted by Governor White, Attorney General Steve Clark and Secretary of State Paul Revere. Pursuant to an equitable retention of jurisdiction created by the majority the same plaintiffs were permitted to attack the 1991 Apportionment Plan developed by then Governor Bill Clinton, Attorney General Winston Bryant and Secretary of State Bill McCuen. I have maintained throughout that this Court has no jurisdiction of the attack on the 1991 Plan. As late as November 15, 1993, I set forth my views on this issue and also stated additional reasons which I believed compelled the *sua sponte* dismissal of this latest attack. See "Dissenting Opinion to Opinion filed September 2, 1993." I adopt those views without repeating them here.

The majority of this three-judge district court concluded that the Court should reach the merits of the claims being asserted by plaintiffs under Section 2 of the Voter Rights Act. Since the named plaintiffs were not of a mind, separate challenges were made by the "Pulaski County Plaintiffs" and by the plaintiffs from East Arkansas which we usually refer to as the "Delta Plaintiffs." The Pulaski County plaintiffs have settled with the State thus leaving us with only the claim of the Delta Plaintiffs. Basically the Delta Plaintiffs objection to the 1991 Plan is that the Board of Apportionment did not go far enough in fashioning that plan to remedy past discrimination. They contend that the

Board could have, and therefore should have, created five majority black voting age population (hereafter VAP) House Districts in the area instead of the four they actually created, and that they should have created two majority black VAP Senate districts instead of the one they actually created. The majority opinion states: "Our task is to determine whether the State's redistricting plan violates Section 2 of the Voting Rights Act because it fails to create additional black-majority districts."

In their response filed December 16, 1993, defendants state that plaintiffs' burden is to demonstrate that the 1991 Plan "results in unequal access to the electoral process" citing *Thornburg v. Gingles*, 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). They contend that, on the uncontested facts, plaintiffs cannot make this showing. I quote from their argument:

Plaintiffs' brief focuses on the relative poverty of blacks in the Delta. It reports census data on the relative socio-economic standing of blacks and whites in the area, and contends that nothing more is required to show unequal ability to participate in the electoral process than to establish a disparity in this realm. Plaintiffs do not contend, though, and they have not proved, that blacks are prevented from registering or voting for the candidates they choose. There is no allegation or proof that black voter turnout is any less than white, or that black voters are hindered in any way from exercising their right to vote. Nor do plaintiffs contend or prove that black voters are unable to elect candidates of their choice under the 1991 plan. Indeed, plaintiffs have not shown the results of a single election under the Board's plan where a black voter-preferred candidate was defeated by a white voter-preferred candidate.

This court has previously held that "[b]lack voters are far from powerless. They exer-

---

**1.** See such dissents in the following *"Jeffers I"* opinions (those dealing with the attack on the 1981 Plan): 730 F.Supp. 196 (1990) dissent begins at 226; 740 F.Supp. 585 (1990), dissent begins at 602; 756 F.Supp. 1195 (1990), dissent begins at 1203. The challenge to the 1991 Plan

*(Jeffers* II) was filed in December, 1991. On September 2, 1993, the majority filed an opinion dealing with the defendant's motion for summary judgment. I filed a dissent thereto on November 15, 1993.

cise significant, sometimes decisive, influence." *Jeffers v. Clinton,* 730 F.Supp. 196, 198 (E.D.Ark.1989). The Court went on to note that "there are no presently existing legal barriers to voting by black citizens in Arkansas." *Id.* at 204. The only circumstance that has changed since that time, as reflected in the current record, is that blacks now elect a proportionate number of representatives in the Delta from solid majority BVAP districts. Evidence of poverty among blacks in the region begs the question of whether blacks are able to participate on an equal basis with whites there. Indeed, the evidence shows that there is *equal* access, because black voters elect representatives of their choice in proportion to their population in the area. In short, there is absolutely no evidence in this case that black voters cannot participate in the electoral process on an equal basis with white voters. Furthermore, nothing indicates that black voters cannot elect representatives of their choice—in fact, the evidence shows just the opposite. Plaintiffs also assert that the Board has impermissibly created influence districts when it could have created majority black districts. Plaintiffs' brief, p. 14–15. They define the area where an additional majority BVAP senate district could be created as the area included in the Board's senate districts 1, 7, 8, 21, 22, 23 and 28. Of these seven districts, two (29%) are majority BVAP—SD 8 and SD 22. The total VAP in these seven districts is 336,944; the BVAP is 107,569 or 32%. See, attachment 1 (a list of the Board's districts and their population breakdowns which the parties have previously submitted as part of the Board's plan). Thus, the Board's plan gives the area represented by these districts 29% of the representation. Black voters represent 32% of the population, but plaintiffs ask for an additional majority BVAP district, or 43% of the representation. Plaintiffs are not entitled to maximization of representation beyond proportionality. *Nash v. Blunt,* 797 F.Supp. 1488 (W.D.Mo.1992).

I agree with most of this argument, but I join my brothers in disagreeing with the suggestion that because the plan creates proportionate representation for black voters in the Delta region plaintiffs' claim must fail. Proportionate representation is an important factor in the overall mix, but the circumstance that blacks have achieved representation in the legislature which is approximately proportionate to their numbers in the upper Delta is not an absolute defense to a voting-dilution claim. This is particularly so when the focus, as here, is one or two districts, rather than a statewide challenge.

The majority acknowledges that plaintiffs seeking to establish a violation of Section 2 must "at a minimum" satisfy the following preconditions set out in *Gingles:*

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.
>
>     \*      \*      \*      \*      \*      \*
>
> Second, the minority group must be able to show that it is politically cohesive.
>
>     \*      \*      \*      \*      \*      \*
>
> Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ...—usually to defeat the minority's preferred candidate.

478 U.S. at 50–51, 106 S.Ct. at 2766.

To establish these preconditions the majority appears to rely, in the absence of other actual proof, upon certain stipulations made by the parties. More particularly, the parties stipulated that this Court had already found, in connection with plaintiffs previous challenge of the 1981 Plan, that:

> J. African Americans are a politically cohesive group in Eastern Arkansas.
>
> K. White voters in eastern Arkansas usually vote sufficiently as a bloc to defeat the African American community's choice except when the candidate of choice runs in a district in which African Americans are a voting majority.

The majority finds "no reason not to accept these two aspects of the plaintiffs' prima

facie as established under *Gingles*." I disagree.

In my view the plaintiffs must prove the *Gingles* preconditions anew whenever they make a new attack on a reapportionment plan. With respect to the two new majority black districts sought by the plaintiffs we have *no new evidence* that the minority citizens in those proposed districts are "politically cohesive" or that "the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." It is not enough that the plaintiffs have convinced the majority on this Court that such conditions existed in 1981 when other district lines were drawn. Plaintiffs must also show that such conditions existed in 1991 when the challenged districting took place. The record herein does not establish those *Gingles* pre-conditions keeping in mind that such proof must be *district specific.*

What we have here is a stipulation by the parties that this Court has already made certain findings. Of course we do not need any stipulation of the parties to tell us what this Court has found the facts to have been in connection with the attack upon the 1981 redistricting plan. So that part of the stipulation really adds nothing by way of proof.

I have already made the point that this court, constituted for the specific purpose of assessing the challenge to the 1981 redistricting plan, has assumed jurisdiction of the 1991 plan, thereby empowering itself to act as a general overseer of these decade apart redistricting efforts. Another by-product of that jurisdictional ruling is, apparently, the waiving of the proof requirements ordinarily mandated in these Section 2 cases. If a new court had been constituted it would not, I suggest, be willing to simply take judicial notice of facts previously found by this Court (in passing on the 1981 Plan) for the purpose of establishing a violation of Section 2 in the drawing of the 1991 plan by different defendants based on different circumstances. And the circumstances of the two attacks are entirely different. The most important difference is that the Board of Apportionment in formulating the 1991 Plan felt obligated to follow the rulings of *this Court* in connection with its ruling on the 1981 Plan. Another

major difference is that in 1981 these plaintiffs made a *statewide* attack whereas here the Delta plaintiffs are seeking one additional majority black House district and one additional majority black Senate district. General proof about "voting patterns in the Delta" should be eschewed in favor of specific evidence about the voting patterns of whites and blacks in specific areas involved in the pertinent time period and evidence showing that the black citizens involved formed a cohesive unit. I am not willing to assume that all black citizens, any more than all white citizens, share common views on education, religion, economics, government or local politics, or that they may be assumed to share common interests and goals. The proof in this regard was not adequate in connection with the 1981 attack; it is practically non-existent in this attack on the 1991 Plan. The stipulation of the parties that "the African American population in the upper Delta is sufficiently large to constitute a majority in one additional single-member state house district and one additional single-member Senate district" tells us nothing about the political cohesiveness of the black citizens in such areas or their voting behavior.

On December 27, 1993, I wrote to the attorneys for the parties requesting some clarification of the "stipulation" filed on December 1, 1993. I particularly inquired about Paragraphs 7(E), 7(I), 7(J) and 7(K). With respect to paragraph 7(E) I asked if the parties had any additional evidence of racially polarized voting beyond that submitted in connection with the attack on the 1981 Plan. With respect to Paragraph 7(J) I asked if there was any evidence of "overt racial appeals" having occurred in any election occurring after our final order on the 1981 plan. With respect to Paragraph 7(J) I asked if the parties had any evidence of the "political cohesiveness" of blacks in Eastern Arkansas beyond the evidence introduced during their attack on the 1981 plan. Finally with respect to Paragraph 7(K) I asked if there was any new evidence supporting the proposition that white voters usually vote as a block to defeat the African American communities choice. Defendants' response states that "there is no evidence to support the stipulation in question other than that which was in evidence at

the previous trial in this case." It further states that the "stipulations" were "merely written to be a summary of the Court's findings in the trial of the 1981 plan." The response further states that the parties "are not relying upon elections occurring after the Court's final order on the 1981 plan." In my letter to the parties I also stated "my assumption is that you mean that when the African American choice is a black person there is 'usually' bloc voting but not when the African American community's choice is a white candidate." The defendants response is that "this is a correct assumption."

The majority opinion states:

Defendants argue that the plaintiffs should be required to prove anew the presence of bloc voting that usually defeats minority-preferred candidates under the Board's current plan. We reject the Board's contention that the long history of bloc voting resulting in white electoral domination, established earlier in this case, must be proved afresh under the new scheme. The Board's approach to this factor relies on an unduly cramped reading of the parties' stipulations, as well as an overly broad understanding of the requirement that any Section 2 violation must be proved anew.

Of course Courts may take judicial notice of certain findings in prior cases but the *Gingles* pre-conditions, in my opinion, must be case specific and established anew in each new Section 2 case. That has not been done here.

Under *Shaw v. Reno* it now appears that redistricting authorities (whether the legislature in connection with federal Congressional redistricting, or a State Board of Apportionment in connection with state legislative redistricting) will not be permitted to intentionally gerrymander in order to create majority or super-majority black districts absent some compelling state interest. But it has been recognized that courts may do so *as a judicial remedy* based upon a finding of a Voting Rights Act violation on a Constitutional violation.

The majority's view of what is essential to prove a Section 2 violation runs head long into this construct and, in doing so, creates an anomalous result, to-wit: The redistrict-

ing agency may not itself intentionally segregate races to create majority-black districts absent a compelling state interest. But if it fails to do so, a federal court may order it to do so (or do it itself) by first finding a Section 2 violation predicated solely on the theory that blacks currently suffer the effects of past discrimination which it concludes results in blacks' having less opportunity to participate in the political process than other members of the electorate. And what proof is required to support such a finding? Only that the court (or another court) has made a similar finding in the past concerning the effects of long-past racial discrimination. So, if one accepts the majority's rationale, without any new or current evidence a court could by this theory declare a redistricting plan violates Section 2 and thereby create the basis for ordering into effect a districting plan that the districting agency itself could not lawfully have created in the first instance. Such "catch–22" situation naturally arise out of the majority's view of the law and of the role of the courts in these voting rights cases.

I agree with the majority's conclusion that "because the plaintiffs have failed to satisfy the compactness pre-condition with respect to both the House and Senate, we must reject their claim." However, I do not fully agree with its analysis of the "compactness" issue. The *Gingles* language is important, to-wit:

Where the minority group is not large enough, geographically concentrated enough, or politically cohesive enough for this to be possible, the minority group's claim fails.

And I agree that the stipulation that the African American population in the upper Delta is sufficient to constitute one additional majority black House district and one additional majority black Senate district does not tell us if such population is "geographically concentrated enough" to comply with constitutional standards. If it is necessary to depart from traditional districting principles in order to bring into a proposed district sufficient numbers of black citizens to form a majority black district then that district immediately becomes suspect. Strange shapes

and configurations reveal the predominate reliance on race in drawing district lines. See *Shaw v. Reno*. The dissent I filed on March 9, 1990, reflects my opinion that this Court departed from traditional principles by adopting plaintiffs' proposed districts instead of those proposed by the defendants in remedying the Section 2 violations it found in the 1981 Plan:

> Before reaching my more fundamental disagreement with the majority's contention that a state is under some duty by virtue of the Voting Rights Act to create supermajority black districts, it must be mentioned briefly that the plaintiffs' proposed remedial plan cannot be accurately characterized as a simple expansion of district boundaries which are as compact and contiguous as those districts proposed by the Board of Apportionment.

> Plaintiffs' alternative plan creates a number of oddly-shaped House districts, the worst being the inverted-"S" configuration of the boundaries for HD 74. If one were to travel in a perfectly straight line he or she could enter and exit this district no less than eight times as the district cuts through townships and municipal boundaries across three counties in an awkward effort to capture sufficient black residents to comprise a supermajority of 63% black VAP.

> A proposed district is sufficiently compact if it retains a natural sense of community, and is not so convoluted that its representatives could not easily tell who actually lives within the district. *East Jefferson coalition v. Jefferson Parish*, 691 F.Supp. 991 (E.D.La.1988). That standard has not been met here. It would be difficult to envision a more bizarre and confusing district than the one proposed by plaintiffs (and adopted by the majority of the judges on this court) for HD 74 and the resulting adjacent districts. For this reason alone, this part of plaintiffs' proposed remedy should be rejected.

What the plaintiffs are saying here is that the defendants could have, and therefore should have, created an additional House District and an additional Senate District in the Delta. However, the defendants could have created such districts only "by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions," *Reno*, at ——, 113 S.Ct. at 2827. But, while *Reno* dealt directly only with the inference that such "bizarre" configurations are unexplainable on grounds other than race, its holding has much more pertinent application to the facts of this case. It is my opinion that race-conscious gerrymandering for the purpose of creating majority (or super-majority) legislative districts must meet the strict scrutiny requirements of the equal protection clause, whatever the appearance of the resulting district. Plaintiffs contend that the defendants should have engaged in such race-based gerrymandering in order to create the additional majority black districts they seek. So we do not need indirect or circumstantial evidence to prove that the additional districts which plaintiffs state the defendants should have created in their 1991 Plan would have been the result of race conscious gerrymandering—the same process, indeed, that plaintiffs went through in developing their own proposals.

As stated in *Hays v. Louisiana*, 839 F.Supp. 1188 (W.D.La.1993):

> A legislature creates a racially-gerrymandered districting plan when it *intentionally* draws one or more districts along racial lines or otherwise intentionally segregates citizens into voting districts based on their race. Thus, "racial gerrymandering" refers to the *intentional*, not the accidental, segregation of voters on the basis of race.

No one suggests that here we are dealing with the accidental segregation of the races. Rather it is the clear intent and objective of plaintiffs' proposal. *Shaw* is further explained in *Hays* as follows:

> We have already noted the narrow holding of *Shaw*: a plaintiff may state a claim under the Equal Protection Clause by alleging that the reapportionment scheme adopted by his state is so irrational on its face "that it can only be understood as an effort to segregate voters into separate voting districts because of their race...." *Shaw* primarily deals with the problem of proving racial gerrymandering *indirectly* or *inferentially*. Racial gerrymandering—

says the Court in *Shaw*—can be inferred when districts are so bizarrely shaped that they presumptively bespeak an impermissible purpose.

But racial gerrymandering may—*a fortiori*—also be proved by *direct* evidence that a legislature enacted a districting plan with the specific intent of segregating citizens into voting districts based on their race. If everyone—or nearly everyone—involved in the design and passage of a redistricting plan asserts or concedes that design of the plan was driven by race, then racial gerrymandering may be found without resorting to the inferential approach approved by the Court in *Shaw*. The Court recognized in *Shaw* that "[n]o inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute." The same is equally true when virtually unanimous, essentially uncontroverted *direct* trial evidence establishes racial classification, as it did here. In this case, we find overwhelming evidence—both *indirect* and *direct*—that the Plan is a product of racial gerrymandering.

And that is the situation we have here. *Hays* cites the following cogent language from Justice Douglas' dissent in *Wright v. Rockefeller*, 376 U.S. 52, 66–67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512:

> When racial ... lines are drawn by the State, the multiracial ... communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race ... rather than to political issues are generated; communities seek not the best representative but the best racial ... partisan.

And good motives alone do not rise to a compelling state interest. As stated in *Hays*:

> Thus, even if benign or benevolent motives underlie a legislature's decision to racially gerrymander a redistricting plan, that plan is still subject to strict judicial scrutiny. As discussed below, good motives may allow a plan to survive strict scrutiny, if they rise to the level of a compelling state interest, and if the plan is narrowly tailored to further such an interest. But such motives—however unspotted—do not automatically exempt the plan from what amounts to a presumption of unconstitutionality.

Here the state did not create the additional districts plaintiffs seek. Had the defendants created such districts what compelling state interests for their action can be found in this record? None, I submit.

In this case the Delta plaintiffs complain that the Board of Apportionment did not go far enough in its efforts to remedy past discrimination. But it is clear that the Board in making the 1991 plan, was not concerned with remedying past discrimination. It assumed that *this court* had already done that in its 1990 rulings on the 1981 plan. The Board's approach was simply to follow the Court approved plan as nearly as it could consistent with the need to adapt to the slightly changed population figures coming out of the 1990 census. So the Board was not trying to figure out how it could create additional majority black or super-majority black districts. The plaintiffs are the ones who are insisting on a race conscious gerrymander aimed at creating additional black majority districts. Clearly if the Board had drawn district lines as suggested by the plaintiffs, then the Board's decision could have been challenged on equal protection grounds as explained in *Shaw v. Reno*.

I also cannot agree with the majority's justification for the creation of super-majority districts, even as a remedy for Section 2 violations. I have set forth my views on this issue at length in my March 6, 1990 dissent, *Jeffers v. Clinton*, 756 F.S. 1195, 1206–1209 (E.D.Ark.1990). It is my view that Section 2 does not require, nor the Constitution permit, the creation of super-majority black legislative districts except in the circumstances I mention in that dissent. And there was no such justification for this court's decision to create super-majority districts back in 1990. And it goes without saying that I cannot agree, as the majority states, that we do not "have sufficient experience to say that super-majorities are no longer required in the Delta." In my view, far from being required, the creation of such districts was not permitted either under the Voting Rights Act or the Constitution regardless of any "experience"

in the use of such districts. Nevertheless, proof of the experience with such super-majority districts would have been interesting. It was, however, not brought forward.

If plaintiffs, other than the *Jeffers* plaintiffs, were attacking these super-majority districts they would, in my opinion, have a "lay-down hand." Packing black voters into such super-majority districts obviously dilutes the overall black political power assuming bloc voting by race. But I agree that these *Jeffers* plaintiffs should be estopped from raising the issue. As stated by the majority:

What once was urged, during the first round of this litigation, as essential to allowing blacks to compete in Delta districts (the supermajority district) is now characterized as dilutive of black voting strength. Moreover, the Board adds, when this Court approved the pre–1990–census plan, we actually required the State to modify its plan in order to add additional super-majority districts. It would be perverse, the State contends, for this Court to find that the existing plan violates Section 2 when it was prepared in good faith with the intention of complying with our clear supermajority requirements. We agree.

I agree with the majority that the Delta plaintiffs' plan for the Senate Districts is "troubling." As stated by the majority:

While they are nowhere nearly so unusual in shape as the I–85 district at issue in *Shaw*, the Senate districts are anything but compact, especially striking when compared with the existing SD 22. The plaintiffs' proposed SD 22, the northern district, simply hugs the Mississippi while the southern district, SD 7, extends a series of long, slender fingers deeply to the west from the River. Both cut across numerous communities and political boundaries. This peculiar shape of these districts, as well as that of some of plaintiffs' House districts, is precisely due to the lack of the compact minority population required by *Gingles.* Because the plaintiffs have failed to satisfy the compactness precondition, with respect to both the House and Senate, we must reject their claim.

I also agree with the majority's conclusion:

We conclude that plaintiffs have failed to prove that the Board of Apportionment's post–1990–census redistricting plan results in less opportunity for black Arkansans who reside in the Delta "to participate in the political process and to elect representatives of their choice."

And I agree with the majority's holding:

We hold that the Board's 1991 redistricting plan satisfies the requirements of Section 2 of the Voting Rights Act with respect to the East Arkansas areas which are the subject of the instant challenge.

To me the most unfortunate legacies of this case are: (1) the majority's creation of a pre-clearance requirement before any newly enacted run-off laws may go into effect, and (2) the majority's continuing endorsement of super-majority black districts. I have expressed my strong view that run-off elections do not adversely affect black voters. See *Whitfield v. Democratic Party of Arkansas,* 686 F.Supp. 1365 (E.D.Ark.1988). But I wish to add to my comments on the effect of creating super-majority black districts. Such districts tend to disenfranchise white voters. It will be asked: so what, do not majority white districts tend to disenfranchise black voters? The answer is: "no" unless there exists a pattern of polarized racial voting. Where there is no racial bloc voting in a district the democratic process is healthy regardless of the percentages of white and black voters in that district. The majority agrees that proof of polarized voting is required as a pre-condition for the creation of super-majority black districts. Racially polarized voting must be viewed as a pathological condition in a democracy such as ours. But, if, where it exists, courts order the creation of super-majority black districts, will such courts be contributing to the solution of that problem or will their order tend to perpetuate that unhealthy condition? As I stated in my March 6, 1990, dissent:

We do not solve the problem of discrimination against one group by discriminating against another group. And, yet, is it not clear that that is exactly what the majority

is doing in this case with its "supermajority" theories?

\*     \*     \*     \*     \*     \*

We do not "get beyond racism" in the political sphere by creating conditions which tend to perpetuate racial separateness. If unintentional violations of Section 2 require the creating of majority VAP black legislative districts, then any increment beyond simple majority status must, in my opinion, be justified.... This "equilibrium remedy" would have the additional merit of necessitating, or at least not foreclosing, coalition building, which, in turn, would reduce the significance of racial politics over time. But when black VAP figures of over 60% are required—as the majority has done here—there will be no need, and therefore no incentive, for the black majority to reach out to their white fellow citizens, that is, to "get beyond racism."

One expects the response, "So what is new? Whites have held such majority status over blacks for years and still do almost everywhere in this nation. Why is that situation all right and this all wrong?" The answer is simple. Until racial polarization occurs, race is not central in the political processes of America. Neither is religion or language. We may be Democrats, Republicans, members of "Third Parties," or Independents. Rational political controversy is shaped by ideas, issues, self-interest, and the perceived merits of the candidates. Black makes no more difference than German or Irish; white than Asian; Christian than Jew or Atheist. Yes our backgrounds (including our racial identities), economic circumstances, political philosophies, and even religious beliefs may affect our politics but, overall, the emphasis is on rational politics. The influence of minority viewpoints in such a mix can be dramatic. And the racial politics that remain—and I recognize that our nation, despite much progress, is not yet beyond the evil and sickness of racism—tend to be submerged over time by the more compelling interests that characterize rational political dispute. Most important, it is not the law that is creating or supporting the racial politics that continues to exist. The law should help us get beyond race. The Congress has done its part by mandating equal opportunity in the political arena. It is wrong for the courts to go beyond Congress' mandate by forcefully creating conditions that reward racial polarization and encourage its perpetuation.

Justice Sandra O'Connor makes the same point more cogently in Shaw:

A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes. By perpetuating such notions, a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract.

The message that such districting sends to elected representatives in equally pernicious. When a district is obviously created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy." Id. at ——, 113 S.Ct. at 2827.

If skin color is to become the talisman for political convictions, rather than Democrat or Republican or Independent or Socialist, etc., then should only the "Black Political Party" be heard from in these cases where courts have found racially polarized voting? Or should not representatives of the premised class of the "White Political Party" also be required so that both sides could be heard

from. Or should not, at least, the court fix responsibility for such polarized voting? Such is the madness generated by the concept of race-based (or language-based, or ethnic-based or religious-based) districting. Add to this the notion of giving one group a super-majority and what is left of representative democracy?

It is fair to ask: How will the General Assembly of the State of Arkansas, or Boards of Apportionment, react to the opinions of this court in the future? Will the extension of the salutary democratic principle of majority rule be chilled by the court's earlier preclearance order, an order the validity of which has not been reviewed by the United States Supreme Court (because of the State's abandonment of the appeal of that issue)? Will, in the future, the legislature and the Board of Apportionment feel free to redistrict on the basis of rational community-of-interest principles, or will race continue to be the controlling factor in such process? Time will tell.