The Honorable Kevin Smith State Senator 1609 Coker-Hampton Drive Stuttgart, Arkansas 72160-5713
Dear Senator Smith:
This is in response to your request for an opinion concerning the "constitutionality of the redistricting of Arkansas state representative and senatorial districts in Eastern Arkansas for the 1990 and 1992 elections in light of the decision in Miller v.Johnson [515 U.S. ___, 132 L.Ed.2d 762], 115 S.Ct. 2475 (1995)." You have enclosed with your request a copy of a University of Arkansas Law Journal article which discusses the Miller case. See
Note, Constitutional Law — Equal Protection — Race Shall Not Be thePredominant Factor in Congressional District Drawing, Miller v.Johnson, 115 S.Ct. 2475 (1995), 19 UALR LJ 109 (Fall 1996).
The resolution of the question you have posed would require an analysis of all the pertinent facts surrounding the creation, characteristics, and make-up of each individual district. As such, it is beyond the scope of an Attorney General's opinion. I can, however, in an effort to be helpful, set out a summary of the relevant law.
The districts to which you refer were drawn pursuant to an order of, and approved by, a three judge panel of the United States District Court, Eastern District of Arkansas prior to the United States Supreme Court decision in Miller. See Jeffers v. Clinton,730 F. Supp. 196 (E.D.Ark. 1989) aff'd mem. 498 U.S. 1019 (1991) (finding a violation of § 2 of the federal Voting Rights Acts in the relevant counties save Pulaski County and ordering new districts to be drawn for the 1990 elections); Jeffers v. Clinton,756 F. Supp. 1195 (E.D.Ark. 1990) summarily aff'd 498 U.S. 1019
(1991) (approving, as modified, the "remedy plan" submitted by the State and retaining jurisdiction to enter other orders to enforce the decree); Jeffers v. Clinton, 740 F. Supp. 585 (E.D.Ark. 1990)appeal dismissed on motion of appellants, 498 U.S. 1129 (1991) (finding some constitutional voting rights violations and imposing a limited preclearance requirement); and Jeffers v. Tucker,847 F. Supp. 655 (E.D.Ark. 1994) (upholding the State Board of Apportionment's post 1990 census plan (for the 1992 elections and thereafter) over the objections of the plaintiffs). In its decisions, the District Court found that the districts existing in 1989 diluted the votes of black citizens in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982, (42 U.S.C. § 1973et seq.). The court ordered that the then existing districts be redrawn to create additional majority black districts, and retained jurisdiction in order to assure that the districts created in the 1991 apportionment complied with the Voting Rights Act. There was a vigorous dissent in the first three of the cases and a concurrence in the fourth. See Jeffers, 730 F. Supp. 196
(Eisele, Chief District Judge, dissenting); 740 F. Supp. 585
(Eisele, Chief District Judge, dissenting); 756 F. Supp. 1195
(Eisele, Chief District Judge, dissenting); and 847 F. Supp. 655
(Eisele, Senior District Judge, concurring).
The initial Jeffers decisions were handed down before, and thus without the benefit of, the United States Supreme Court decision in Miller v. Johnson, supra, and a predecessor case, Shaw v. Reno. The Miller decision was actually the second decision in a recent wave of decisions interpreting the constitutionality of districts drawn to enhance minority voting strength. The first was Shaw v.Reno, 509 U.S. ___, 125 L.Ed.2d 511, 113 S.Ct. 2816 (1993) ("Shaw I"), which held that bizarrely shaped districts, created for the purpose of favoring the voting interest of minorities, were unconstitutional under the "equal protection clause" unless narrowly tailored to further a compelling state interest (applying the so-called "strict scrutiny test"). In Miller, the Court clarified that the strict scrutiny test is to be applied whenever the legislature subordinates "traditional, race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions, or communities defined by actual shared interests, to racial considerations," and not just when districts are found to be bizarrely shaped. Miller, at 779, 780.
The state of the law on equal protection challenges to redistricting decisions thus involves the analysis of two questions: 1) Were traditional districting principles subordinated to race in the drawing of the districts — i.e., was race the "predominant factor" in the redistricting — if so, "strict scrutiny" applies; and 2) is there a compelling governmental interest supporting the use of race as a predominant factor, and are the districts narrowly tailored to serve that interest?
Each of these questions require the analysis of facts as well as law. The first appears to be almost exclusively factual. Whether race was the predominant factor in drawing the districts to which you refer is a question of fact. Relevant for purposes of the second question (involving the existing of a compelling state interest), is the fact that a federal district court ordered the drawing of the districts in question under the federal Voting Rights Act. Two very recent United States Supreme Court decisions provide guidance on this question. In Shaw v. Hunt, 517 U.S. ___,135 L.Ed.2d 207, 116 S.Ct. 1941 (1996) ("Shaw II"); and Bush v.Vera, 517 U.S. ___, 135 L.Ed.2d 248, 116 S.Ct. 1941(1996), the Court "assume[d] without deciding that compliance with [Section 2 of the Voting Rights Act], as interpreted by our precedents . . . can be a compelling state interest." Vera plurality opinion at p. 1960; Shaw II, majority opinion at p. 1905. Justice O'Connor, in her concurring opinion in Vera, stated that she would hold compliance with Section 2 a compelling interest. Vera, supra at 1968. From a reading of the pertinent decisions, it appears that this would be the holding of a majority of the Court.
Thus, compliance with the federal Voting Rights Act can be a compelling public interest supporting a predominant use of racial data in drawing electoral districts. The Court has been clear to point out, however, with regard to the "narrowly tailored requirement" that "compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." Miller, supra at 783. (Emphasis added). Most recently, in Bush v. Vera, supra, the Court stated that Section 2 of the Voting Rights Act "does not require a State to create, on predominantly racial lines, a district that is not `reasonably compact.' [Citation omitted.] If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district; if a reasonably compact district can be created, nothing in § 2 requires the race-based creation of a district that is far from compact." Bushv. Vera, supra at 270.
The fact that the Arkansas districts in question were ordered and approved by a federal district court in order to comply with the federal Voting Rights Act may be viewed as a compelling public interest which would justify the districts under strict scrutiny analysis even if it was found that race was the predominant factor in their creation. Of course, the relevant federal district court decisions were made without the benefit of the three latest Supreme Court decisions on the topic. Other federal courts have overturned such pre-Miller and Vera decisions where the previously ordered districts did not meet the new U.S. Supreme Court criteria. See, e.g., Johnson v. Mortham, 926 F. Supp. 1460
(N.D.Fla. 1996). A question may remain, therefore, as to whether the United States Supreme Court or lower federal court with jurisdiction would deem the Arkansas districts "reasonably necessary" to comply with the Voting Rights Act, or as "reasonably compact" nothwithstanding that Act. Again, the ultimate issue is one of fact, which would have to be determined by a factfinder, with access to all the pertinent evidence.
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh